# In the United States Court of Federal Claims

No. 14-941T

(Filed: May 20, 2016)

|  |  |  |
|---|---|---|
| **JEFFREY W. HERRMANN and MINA GEROWIN HERRMANN,** | ) ) ) ) | Tax case; motion to compel deposition and document production from the government; motion to compel document production from a nonparty; motion by the nonparty for a protective order |
| **Plaintiffs,** | ) ) |  |
| **v.** | ) ) |  |
| **UNITED STATES,** | ) ) |  |
| **Defendant.** | ) ) ) |  |

Nathan E. Clukey, King & Spalding LLP, Washington, D.C. for plaintiffs.  With Mr. Clukey on the briefs and at the hearing were Abraham N.M. Shashy, Jr. and Ariana Wallizada, King & Spalding LLP, Washington, D.C.

Matthew D. Lucey, Attorney, Tax Division, United States Department of Justice, Washington, D.C. for defendant.  With Mr. Lucey on the briefs were Caroline D. Ciraolo, Acting Assistant Attorney General, Tax Division, and David I. Pincus, Chief, Court of Federal Claims Section, and G. Robson Stewart, Assistant Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C.

Marc R. Rosen, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, New York for nonparties Paulson & Co. Inc. and Paulson Europe LLP.  With Mr. Rosen on the briefs and at the hearing was Robert M. Tuchman, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, New York.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiffs in this tax case, Jeffrey Herrmann and Mina Gerowin Herrmann (the "Herrmanns"), seek a refund of income tax and interest paid in connection with receipt by Ms. Herrmann of $18,748,838 in the beginning of 2009 while she was resident in London working for Paulson Europe LLP ("PELLP").  The key question in the case is whether Ms. Herrmann received that payment as a partnership distribution or whether it was a bonus paid to her in a capacity other than as a partner.  *See Herrmann v. United States*, 124 Fed. Cl. 56, 58 (2015) (denying a motion by defendant for partial dismissal of the complaint and a motion by plaintiffs for partial summary judgment).  Discovery in the case is now underway, and disputes have arisen.  To address the disputes, plaintiffs have filed two motions to compel, covering three separate issues related to fact discovery.  First, the Herrmanns have asked this court to compel

the defendant ("United States" or the "government") to allow them to depose Joseph Scott, a revenue agent with the Internal Revenue Service ("IRS"), free of certain restrictions the government has sought to impose. Pls.' Mot. to Compel Disc. ("Pls.' Mot. to Compel") at 1-2, ECF No. 40. The government had advised plaintiffs that Mr. Scott needed a "testimony authorization" from the IRS specifying the topics to which his deposition will be limited. Def.'s Resp. to Pls.' Premature Mot. to Compel Dep. and Mot. to Compel Produc. of Docs. ("Def.'s Opp'n") at 4, ECF No. 46. The government also had indicated that under the Supreme Court's decision in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and 26 C.F.R. ("Treasury Regulations") §§ 301.9000-1 to -7 (the IRS's so-called "*Touhy* Regulations"), the IRS could bar Mr. Scott's deposition absent authorization. *See* Pls.' Mot. to Compel at 1; Def.'s Opp'n at 4. Plaintiffs argue that the IRS's *Touhy* Regulations do not apply to cases in which the United States is a party and that the government has misapplied the Treasury Regulations requiring authorization from the IRS before Mr. Scott could be deposed. Pls.' Mot. to Compel at 1-2.

Second, the Herrmanns ask this court to compel the government to produce several categories of documents it withheld in response to the Herrmanns' discovery request. Pls.' Mot. to Compel at 18. The government asserts that these documents were used internally by the IRS in its prior determination of plaintiffs' tax liability and during the related audit of PELLP. Def.'s Opp'n at 2. Accordingly, the government claims these documents are not relevant or discoverable in the present case because this is a *de novo* proceeding in which the court must make its own determination of plaintiffs' tax liability. *Id*.

Additionally, the Herrmanns request that the court compel Ms. Herrmann's former employers, Paulson & Co. Inc. ("Paulson & Co.") and PELLP, to produce unredacted versions of requested documents related to this case, or alternatively establish claims of privilege for those documents. Pls.' Mot. to Compel the Produc. of Docs. ("Pls.' Paulson Mot."), ECF No. 45. Paulson & Co. and PELLP (collectively, "Paulson") assert that they have complied with all of plaintiffs' document requests except those pertaining to the compensation and ownership interests of individuals associated with Paulson other than Ms. Herrmann. Paulson has filed a cross-motion for a protective order to prevent this information from being disclosed. Paulson's Opp'n to Pls.' Mot. to Compel the Produc. of Docs. and Cross-Mot. for a Protective Order ("Paulson's Cross-Mot."), ECF No. 49.[1]

These motions have been fully briefed and were argued at a hearing on May 12, 2016. For the reasons discussed in this opinion, the court concludes that plaintiffs' motions to compel directed at the government should be granted. The court also concludes that the plaintiffs' motion to compel directed at Paulson should be granted in part and denied in part, and that Paulson's cross-motion for a protective order should be granted in part and denied in part.

---

[1]Paulson had also moved for an order requiring plaintiffs to pay Paulson's reasonable expenses in responding to plaintiffs' motion. Paulson withdrew this motion at the hearing that addressed these discovery disputes. Hr'g Tr. 89:19 (May 12, 2016), ECF No. 52. The date of the hearing will be omitted from further citations to the transcript.

# BACKGROUND[2]

## A.  *Summary of the Case and Prior Proceedings*

The Herrmanns are both citizens of the United States, and from 2005 to 2007 Ms. Herrmann worked for Paulson & Co. in New York as a hedge fund manager.  *See Herrmann*, 124 Fed. Cl. at 59.   In 2007, Paulson & Co. asked Ms. Herrmann to move to London and work for its affiliate, PELLP, which Ms. Herrmann joined as a member in January 2008.  *Id.* Ms. Herrmann considered the $18 million payment she received at the beginning of January 2009 to be an annual bonus from PELLP, similar to the annual bonuses she previously received from Paulson & Co.  *Id.* at 58-59.  Ms. Herrmann "did not receive a Schedule K-1 or equivalent partnership U.S. tax information from PELLP for the 2008 tax year," and the Schedule K-1 she received for the 2009 tax year did not reflect the $18 million payment.  *Id.* at 60.  The Herrmanns did not report the $18 million payment on their original 2008 or 2009 U.S. tax returns, but they did report it on their 2009 U.K. tax return and paid taxes on it at a rate higher than that which was applicable in the United States.  *Id.*

The IRS audited PELLP beginning in October 2011.  *Herrmann*, 124 Fed. Cl. at 60.  During this process, Ms. Herrmann received a Schedule K-1 from PELLP reflecting the $18 million payment as a partnership distribution.  *Id.* at 61.  The IRS subsequently issued the Herrmanns a Notice of Computational Adjustment based on this Schedule K-1, finding that the Herrmanns had under-reported their income for 2008 and owed approximately $6.7 million in additional taxes, plus interest and penalties.  *Id.*  In July 2012, the IRS issued the Herrmanns a Notice of Tax Due showing this deficiency as approximately $7.5 million.  *Id.*  The Herrmanns attempted to address this deficiency by amending their 2008 U.S. tax return to include the $18 million payment as partnership income, applying approximately $6.7 million in foreign tax credit accrued by the end of 2008, and paying approximately $37,000 in additional tax.  *Id.* at 62.  The IRS did not accept this amended return as satisfaction of the tax due, and the Herrmanns made an additional tax payment of approximately $7.86 million on October 11, 2012.  *Id.*

A day after making this payment, the Herrmanns filed a Claim for Refund in the same amount as the additional tax paid.  *Herrmann*, 124 Fed. Cl. at 62.  As part of this refund claim, the Herrmanns filed Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request, asserting that the $18 million payment and certain additional income were payments to Ms. Herrmann other than in her capacity as a partner under 26 U.S.C. (Internal Revenue Code or "I.R.C.") § 707(a)(2).  *Id.*  Alternatively, the Herrmanns asserted they should be able to apply a foreign tax credit to the tax due.  *Id.*  The IRS disallowed the refund claim in September 2013.  *Id.*  After an unsuccessful appeal to the IRS Appeals Office, the Herrmanns filed their claim in this court on October 3, 2014.  *Id.* at 63.[3]

---

[2]The court has drawn upon its prior opinion and the submissions of the parties attendant to the pending motions to provide a background and context for the case.

[3]After the Herrmanns filed their suit in this court, the IRS assessed penalties against the Herrmanns which the Herrmanns have not paid.  Hr'g Tr. 15:12-20.  After the Herrmanns' administrative appeal regarding those penalties was denied, the Herrmanns contested the

At issue in this case are disputes between the Herrmanns and the IRS regarding the proper characterization of the $18 million payment and the resulting tax liability, if any. *Herrmann*, 124 Fed. Cl. at 58. Count One of the Herrmanns' complaint centers on whether the IRS failed to properly apply a foreign tax credit to the Herrmanns' U.S. tax liability, based on the taxes they paid to the United Kingdom. *Id.* Count Two disputes the IRS's characterization of the $18 million payment as a partnership distribution to Ms. Herrmann, the main consequence of which is that if the payment was a bonus rather than a partnership distribution, the Herrmanns – as cash-basis taxpayers – did not need to report it as income until it was received in 2009, and at that point they could claim a foreign tax credit reflecting the tax paid to the United Kingdom in 2009. *Id.* Count Three relates to the foreign tax credit at issue in Count One and alleges the IRS improperly denied the Herrmanns' request to adopt the accrual accounting method for the purposes of this credit. *Id.* Finally, Count Four claims the IRS violated certain provisions of the Tax Equity and Fiscal Responsibility Act ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324 (1982) (codified at I.R.C. §§ 6221-6234), by excluding Ms. Herrmann from the audit of PELLP in 2011 and 2012. *Id.* at 58, 67-68.

In August 2015, the Herrmanns moved for summary judgment on Count One, claiming that even if the $18 million payment was a partnership distribution that should have been reported on their 2008 U.S. tax return, they are entitled to a refund of approximately $5.2 million based on their foreign tax credit. *Herrmann*, 124 Fed. Cl. at 58, 67. Contemporaneously, the government moved to dismiss Counts Two and Four for lack of subject matter jurisdiction and failure to state a claim. *Id.* at 58. The court considered these motions together at a hearing on October 7, 2015. *Id.* at 59. The court denied plaintiffs' motion for summary judgment, finding that even though the Herrmanns are entitled to a tax credit, "[n]o enforceable and realizable judgment could be entered under Count One alone" because the other counts in the complaint also affect the Herrmanns' tax liability for the 2008 and 2009 tax years and the amount of the resulting refund was consequently uncertain. *Id.* at 69 (citing *Houston Indus. Inc. v. United States*, 78 F.3d 564, 568 (Fed. Cir. 1996)).[4] The court also denied the government's motion to dismiss Count Two, finding that although I.R.C. § 7422(h) generally bars refund claims for taxes related to partnership items, the Herrmanns met the exception in I.R.C. § 6228(b) because they filed a valid administrative adjustment request with their refund claim. *Id.* at 66-67. Finally, the court denied the government's motion to dismiss Count Four because the Herrmanns' allegations of TEFRA violations, although not an independent basis for monetary relief, supplemented the refund claims in Counts One and Two. *Id.* at 67-68. Following this decision, the court issued a scheduling order guiding the parties' discovery efforts through October 14, 2016. Order of Dec. 28, 2015, ECF No. 39.

_____

penalties in the Tax Court. Hr'g Tr. 15:21 to 16:16. The case in the Tax Court is now stayed by mutual consent of counsel. Hr'g Tr. 16:24 to 17:14.

[4]The court also denied plaintiffs' motion for clarification, filed November 9, 2015, in which they contended "that the court should have granted partial summary judgment in their favor insofar as liability is concerned, even though the amount of relief to which they would be entitled remains uncertain." Order of Dec. 10, 2015, ECF No. 37.

B.  *Current Discovery Disputes*

1.  *Asserted restrictions on the deposition of Mr. Scott.*

As part of their discovery efforts, the Herrmanns on December 9, 2015 submitted to the government a notice of deposition for Mr. Scott.  Def.'s Opp'n at A-1.  The government responded that Mr. Scott could not be deposed unless the Herrmanns provided a list of deposition topics, which government counsel would use to obtain a "testimonial authorization" from the IRS.  Def.'s Opp'n at A-5; *see also* Pls.' Mot. to Compel at 1.  As support for this requirement, the government cited the IRS's *Touhy* Regulations.  Def.'s Opp'n at A-7.  The government also asserted that "[n]one of Mr. Scott's testimony is relevant to the court's *de novo* review of the Herrmanns' tax liability."  Def.'s Opp'n at A-6.

Plaintiffs' counsel initially objected to the government's statement that a "testimonial authorization" was necessary, but the Herrmanns eventually provided a list of five deposition topics for Mr. Scott:

1.  The IRS's exclusion of [Ms. Herrmann] from the audit of [PELLP], evidence supporting any initial determination by the IRS that [Ms. Herrmann] was not a partner in [PELLP] or not eligible to participate in the audit of [PELLP], evidence on which the IRS relied in concluding that [Ms. Herrmann] was a partner in [PELLP], and IRS procedures followed during the [PELLP] audit.
2.  The facts and issues examined by the IRS during the IRS's individual audit of the Herrmanns.
3.  The IRS's issuance of a Notice of Computational Adjustment, the error in the Notice of Computational Adjustment, the fact that the IRS did not revise the Notice of Computational Adjustment, and the fact that the IRS did not apply foreign tax credits to the asserted tax liability of the Herrmanns.
4.  The evidence, if any, considered by the IRS in determining whether [PELLP] timely filed a 2008 Schedule K-1 for [Ms. Herrmann] in 2009.
5.  The declaration filed by Agent Scott in the litigation.

Pls.' Mot. to Compel at 12; Def.'s Opp'n at A-8 to -9.[5]

The government responded that the majority of the Herrmanns' deposition topics pertained to information that was irrelevant, but it indicated that "the IRS will authorize Mr. Scott to testify" as to "whether Ms. Herrmann was excluded from participating in the [PELLP] audit . . . as well as Ms. Herrmann's status as a notice partner."  Def.'s Opp'n at A-10.  The government also provided its own proposed list of deposition topics for Mr. Scott:

1.  The existence of an IRS examination of [PELLP's] 2008 taxable year.

---

[5]The quoted list reflects plaintiffs' revisions to the proposed deposition topics as of March 16, 2016, which revisions took into account commentary by the government.  *See* Pls.' Mot. to Compel at 12 n.5.

2. Facts concerning [Ms. Herrmann's] status as a notice partner of [PELLP] for the 2008 tax year.

3. [Ms. Herrmann's] participation as a notice partner, or the participation of any person on behalf of [Ms. Herrmann] in her role as a notice partner, in the IRS's examination of [PELLP's] 2008 taxable year, including the issuance of a Notice of Beginning of Administrative Partnership Proceeding and counsel's appearance at a closing conference.

4. Identification of the two issues (the partnership distribution and the proper application of the foreign tax credit) examined by the IRS during the IRS's audit of the Herrmanns' joint tax liability. The term audit as used in the preceding sentence only refers to the audit of the Herrmanns' joint tax liability and does not include the audit of [PELLP's] 2008 taxable year or the IRS'[s] review of the Herrmanns' refund claim. [Alternatively, we are willing to stipulate that the IRS considered the partnership distribution and the proper application of the foreign tax credit during the IRS's audit of the Herrmanns].

5. Partnership items used in the calculation of the amount due contained in the Notice of Computational Adjustment.

6. Paragraphs 1, 2, 9, and 10 of the declaration filed by Mr. Scott in the litigation.

*Id.* at A-12 (bracketed sentence at the end of item 4 in original). The government stated that it was "willing to stipulate" that "[t]he only 2008 [S]chedule K-1 for [Ms. Herrmann] from [PELLP] reviewed by Mr. Scott in 2011 was received from [PELLP] in 2011." *Id.* The government's counsel advised that this list was "the final attempt to accommodate the list of topics" provided by plaintiffs' counsel. *Id.* at A-13. The Herrmanns rejected the government's recast list of deposition topics and filed the present motion to compel Mr. Scott's deposition without the government's stated restrictions. Pls.' Mot. to Compel at 1.

## 2. *The government's refusal to produce certain documents.*

Relatedly, on May 15, 2015, the Herrmanns served a request that the government produce documents pertaining to the IRS's audit of PELLP and the determination of the Herrmanns' joint liability for the 2008 tax year. Pls.' Mot. to Compel at 18. The request asked for documents related to 21 numbered items or issues. *Id.* On June 22, 2015, the government produced four documents related to Requests 3, 4, 10, and 16, while asserting that "no . . . documents exist" responsive to Requests 2, 9, 17, 18, and 19. *Id.* On March 22, 2016, the government provided three documents in response to Request 8 and seven documents in response to Request 15. *Id.*; Def.'s Opp'n at A-17 (Def.'s Supplemental List).[6] The Herrmanns now challenge the government's refusal fully to produce documents related to the following requests:

---

[6]Request 8 asked the government to produce "[a]ll documents, if any, indicating that PELLP filed a 2008 Form K-1 for Ms. Herrmann with the IRS in 2009 including, but not limited to, IRS Service Center records, IRS transcripts, and IRS matching program records." Pls.' Mot. to Compel at 20 (quoting Request 8). At the hearing, the government clarified that it had offered to provide plaintiffs a transcript of the PELLP tax return for 2008, which would indicate whether the IRS has a record of receiving a Schedule K-1 for Ms. Herrmann that year. Hr'g Tr. at 23:3 to

1.  All documents reviewed, considered, used, or relied upon in preparation of the IRS's Notice of Computational Adjustment for the Plaintiffs' tax year 2008.

5.  All documents concerning whether to revise, correct, or amend the IRS's Notice of Computational Adjustment because of the corrected 2008 PELLP [Schedule] K-1.

6.  All documents reviewed, considered, or relating to the amount of tax that the Herrmanns should owe based on the corrected 2008 PELLP [Schedule] K-1, including but not limited to computations, calculations, analyses, and workpapers.

11.  All documents identifying all return preparers, advisors, representatives, employees, partners, or members of Paulson & Co. or [PELLP] who stated that [PELLP's] partnership return for the 2008 tax year filed with the IRS included all [Schedule] K-1's for all of the U.S. partners/members, including but not limited to witness interview notes or memoranda.

13.  All [d]ocuments relating to the TEFRA audit of [PELLP] and the number of meetings and telephone calls IRS personnel had with persons at Paulson & Co., persons at [PELLP], or lawyers, accountants, tax preparers, advisors, or other representatives for either company.

14.  All documents relating to or reflecting communications with persons at Paulson & Co., persons at [PELLP], or lawyers, accountants, tax preparers, advisors, or other representatives for either company, in connection with the TEFRA audit of [PELLP].

Pls.' Mot. to Compel at 18 & Ex. 2 (Pls.' First Set of Requests to Def. for Produc. of Docs.).

The government generally objects that the requested documents are irrelevant to the Herrmanns' claim. Def.'s Opp'n at 23. The government asserts that because the present case is a *de novo* proceeding, the court will make its own determination of the Herrmanns' entitlement to a refund and "th[e] case is not a review of the correctness of the IRS's Notice of Computational Adjustment." *Id*. at 24. Therefore, the government claims that internal documents generated by the IRS in its determination of the Herrmanns' tax liability or during the audit of PELLP are not discoverable information. *Id*.

3.  *Paulson's refusal to produce certain documents.*

The Herrmanns also served a subpoena *duces tecum* on Paulson on January 6, 2016 to produce documents related to Ms. Herrmann's employment, the compensation structure for her and others associated with Paulson during the relevant time period, and the audit of PELLP. Pls.' Paulson Mot. at 1 & Ex. 1 ("Paulson Subpoena"). Counsel for Paulson responded in writing on January 20, 2016 stating several general objections to the requests, including that the requests were unduly burdensome, vague, or overbroad; that the requested documents contained confidential or privileged material; that the subpoena did not allow a reasonable time to reply;

---

24:11. The parties subsequently filed a Joint Notice, ECF No. 53, stating that the cited document had been provided and that the government thus had satisfied Request 8.

that providing certain documents would breach contractual or other obligations; there was not a provision to reimburse Paulson for disclosure-related expenses; and the requests were "inconsistent with applicable law" and this court's rules. *Id.* Ex. 2 (Letter from Paulson's counsel to Pls.' counsel). The letter stated that Paulson "intend[ed] to produce non-privileged, non-objectionable documents in [its] possession or control by February 29, 2016." *Id.* Paulson produced one document as of that date. *Id.* at 2.

To address Paulson's concerns about confidentiality, the parties jointly moved for a protective order on March 29, 2016, ECF No. 41, and the court entered the proposed order on March 31, 2016, ECF No. 42. Five days later, on April 5, 2016, Paulson "produced 89 documents totaling 1367 pages" to the Herrmanns. Pls.' Paulson Mot. at 2. Of this production, 746 pages were either fully or partially redacted. *Id.* At the time, Paulson did not indicate why these redactions had been made, nor did it provide a privilege log describing the withheld material. *Id.* at 2-3. Paulson later asserted that it had redacted the produced documents and withheld other documents based, in part, on its continued objection that the redacted or withheld information is sensitive and irrelevant to the present case. Paulson's Cross-Mot. at 6.

After further discussions with plaintiffs' counsel, Paulson agreed to re-issue the documents produced on April 5th "with most relevancy-based redactions lifted, and to produce additional documents withheld on the basis of relevance/overbreadth." Paulson's Cross-Mot. at 6. Paulson provided these documents on April 20th, but it indicated that it had still redacted or withheld compensation and ownership information for individuals other than Ms. Herrmann. *Id.*; Pls.' Reply to Paulson's Cross-Mot. ("Pls.' Paulson Reply") at 3, ECF No. 50.[7] The remaining redactions in the newly provided documents included two fully redacted documents marked Paulson_00001482 and Paulson_00001487, one partially redacted spreadsheet marked Paulson-_00001727, and page 20 of the PELLP partnership agreement marked Paulson_00001789, which appeared to contain the "voting rights and capital contributions of two members of PELLP." Pls.' Paulson Reply at 3-4. Paulson did not provide a privilege log with the revised documents, but its counsel clarified at the hearing that some of the redactions were made based on attorney-client privilege. Hr'g Tr. at 86:14-20.

On May 5, 2016, Paulson produced additional documents not included in the April 5th or April 20th productions. *See* Paulson's Cross-Mot. at 7. Paulson asserts that it has now "produced all documents it has identified as responsive to virtually all of plaintiffs' requests, withholding or redacting only those documents which reflect the specific compensation and ownership interests of individuals at Paulson other than Ms. Herrmann." *Id.* The withheld documents pertain to the following document requests:

9. All documents . . . concerning the bonuses paid by Paulson & Co. . . . and/or [PELLP] to [Ms. Herrmann] and to [Paulson's] partners and employees who received bonuses based on profitability formulas for the years 2006 through 2012, including all backup documentation.

---

[7]Plaintiffs assert that they only received a "cover letter" from Paulson on April 20th, and that they received the documents the following day. Pls.' Paulson Reply at 3 n.3.

10.  To the extent not produced in response to request Number 9 above, all
documents reflecting or concerning how the bonuses paid by [PELLP]
and/or Paulson & Co. . . . to the following individuals during the years 2006
through 2010 were determined, including all documents reflecting the bonus
formula that was used and when the bonuses were paid: [List of ten
individuals.]

11.  Documents reflecting or concerning the percentage of each member's
ownership interest in [PELLP] in years 2007 through 2010, including
documents reflecting any redetermination of the percentage of ownership
interest for U.S. or U.K. corporate or income tax purposes.

Paulson Subpoena Attach. at 2-3; *see also* Paulson's Cross-Mot. at 9 (asserting that Paulson has
fully complied with Requests 1-8 and 12-20 of the subpoena); Hr'g Tr. at 85:22 to 86:20
(addressing the disputed requests).

## ANALYSIS

A.  *Motion to Compel the Deposition of Mr. Scott Without Restrictions Imposed By the
Government*

1.  *Whether the plaintiffs' motion to compel is premature.*

As a preliminary matter, the government argues that the plaintiffs' motion to compel is
procedurally improper because Mr. Scott has not yet "failed to answer a question" or otherwise
refused to testify in the present case. Def.'s Opp'n at 7 (citing Rule 37(a)(3)(B)(i) of the Rules
of the United States Court of Federal Claims ("RCFC")). The government suggests that "the
proper procedure here would be to take Mr. Scott's deposition and then file a motion to compel
to the extent he refuses to testify." *Id.*[8]

---

[8]In its response, the government also argued that Mr. Scott is not a party to the case, and
he is therefore not required to appear at a deposition until he has been served with a subpoena,
which the plaintiffs had not done. Def.'s Opp'n at 7 (citing RCFC 30(a)(1) and 45). The parties
disagree as to whether Mr. Scott, an agent of the IRS who has been  a "Senior Team Coordinator
since 1988," is a party to the case. Pls.' Reply to Def.'s Opp'n ("Pls.' Reply") at 6 n.5 (quoting
Decl. of Joseph G. Scott (Sept. 23, 2015) ("Scott Decl."), appended to Def.'s Reply to Pls.' Resp.
to Def.'s Mot. for Partial Dismissal, ECF No. 27), ECF No. 47. If a "party," he would be
required to appear at a deposition when served with a notice pursuant to RCFC 30(a), and a
subpoena under RCFC 45 would not be necessary. *See* Def.'s Opp'n at 7 ("Plaintiffs have not
even issued a subpoena to Mr. Scott (a non-party), which is necessary for Mr. Scott to even be
required to appear at a deposition."); Pls.' Reply at 3-6 (arguing that the IRS is a party to the case
and that Mr. Scott is therefore subject to deposition by notice). At the hearing, plaintiffs
indicated that they would serve Mr. Scott with a subpoena to obviate the government's concerns
in this respect. Hr'g Tr. at 50:15-18. With the assumption Mr. Scott has now been served with a
subpoena, the court considers the government's argument that Mr. Scott is not required to appear
at a deposition to be moot. In any event, as early as February 17, 2016 the government had taken
steps to arrange for Mr. Scott's deposition, *see* Def.'s Opp'n at A-10 (letter from government

RCFC 37(a)(3)(B) specifies that a party "may move for an order compelling an answer, designation, production, or inspection" in response to a discovery request.  The moving party must certify that it "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."  RCFC 37(a)(1).  One of the situations in which a motion to compel is permissible is when "a deponent fails to answer a question asked under" the procedural rules governing oral and written depositions (RCFC 30 and 31).  RCFC 37(a)(3)(B)(i).  Paragraph (4) of this rule states that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."  RCFC 37(a)(4).  Attempts to limit the scope of a deposition or the availability of a deponent prior to the deposition itself would be considered "an evasive or incomplete disclosure, answer, or response" under this rule.  Indeed, this court has previously considered motions to compel the deposition of individuals when the opposing party has sought to impose restrictions on the content or structure of the deposition.  *E.g.*, *Northrop Grumman Corp. v. United States*, 75 Fed. Cl. 761, 767-68 (2007) (considering, although ultimately denying, plaintiff's motion to compel the deposition of a former government employee when the government opposed the use of classified information during the deposition); *Boston Edison Co. v. United States*, 75 Fed. Cl. 557, 559-63 (2007) (considering the government's cross-motion to compel the deposition of an attorney where plaintiff's counsel stated in a letter that plaintiff would object to the deposition).

The government cites *Resource Investments, Inc. v. United States* for the proposition that "a motion to compel testimony is inappropriate unless and until the witness in question refuses to testify." 93 Fed. Cl. 373, 378 (2010).  In *Resource Investments*, the court also considered a situation in which the government invoked an agency's *Touhy* regulations – in that case, the regulations of the Army Corps of Engineers (the "Corps") – to limit an employee's testimony in a suit against the government.  *Id.* at 376-77.  The employee, Mr. Barrows, was a private consultant when he was originally retained by the plaintiffs, but he had been reemployed by the Corps during the course of the litigation.  *Id.*  After his reemployment, government counsel informed the plaintiffs that Mr. Barrows could not speak with plaintiffs' counsel without a government attorney present, and that he could no longer serve as plaintiffs' expert witness because of Corps regulations prohibiting such a "conflict of interest."  *Id.*  The plaintiffs then moved for a protective order to allow Mr. Barrows to testify on their behalf, and to prevent the government from interfering with plaintiffs' "access" to him.  *Id.* at 375.  As here, the government argued that plaintiffs' motion was premature because Mr. Barrows had not failed to respond to a subpoena or otherwise refused to testify.  *Id.* at 378-79.

The court in *Resource Investments* stated that the discovery dispute's procedural posture was "something of a puzzle," in part because of "the parties' mutually ill-attuned arguments." *Resource Invs.*, 93 Fed. Cl. at 378.  The plaintiffs' motion was "in part . . . premature" because a protective order "would be appropriate only in opposition to a motion from defendant, pursuant to RCFC 45(c)(3), seeking to bar Barrows's subpoenaed testimony."  *Id.*  As a result, the court

---

counsel offering dates when Mr. Scott is available for deposition), which belies the assertion that a subpoena was necessary.  Accordingly, the court will only address whether plaintiff's motion to compel is premature given the fact that Mr. Scott has not yet refused to answer a question during a deposition.

decided to treat the plaintiffs' motion as a motion to compel, but still noted that such a motion was inappropriate because Mr. Barrows had not refused to testify, and because the typical response to such a refusal would be to subpoena Mr. Barrows under RCFC 45, which the plaintiffs had not done. *Id.* at 378 & n.5.  The court nevertheless granted plaintiffs' motion in part, ordering the government to stop interfering with plaintiffs' access to Mr. Barrows and finding that the Corps' regulations prohibiting Mr. Barrows from testifying as an expert witness were inapplicable in the context. *Id.* at 383.  The court based its decision on the fact that the government's refusal to allow Mr. Barrows to testify was "unmistakable" and that government counsel had "unquestionably 'invoked' and acted upon the authority of [the Corps'] regulations." *Id.* at 378.  The court declined to grant plaintiffs' motion in full, not because it was procedurally deficient, but because plaintiffs had not yet ascertained whether Mr. Barrows was willing, in the absence of the Corps' restrictions, to serve as an expert witness. *Id.* ("expert testimony is ordinarily a matter of private contract and may not be compelled").

Accordingly, the holding in *Resource Investments* is not an authority that indicates a court should not consider a motion to compel made prior to a deponent's refusal to testify or to refuse to answer questions on certain topics.  In fact, this decision supports the Herrmanns' contention that such a motion is appropriate where the government has made an "unmistakable" statement limiting a deponent's testimony and "unquestionably invoked" disclosure-limiting regulations. *Resource Invs.*, 93 Fed. Cl. at 378.  Like the situation in *Resource Investments*, the government here has definitively stated that, based on the Treasury Regulations, "the IRS will not authorize Mr. Scott to testify on topics other than [Ms. Herrmann's status as a notice partner]." Def.'s Opp'n at A-10.  This leaves little doubt that if asked a question on any other subject, Mr. Scott will refuse to answer.  Therefore, the court can consider the Herrmanns' motion to compel notwithstanding the fact that Mr. Scott has not formally refused to answer questions at a deposition.

    2.   *Whether the government can use the IRS's "*Touhy *Regulations" to limit the scope of Mr. Scott's deposition.*

The government next argues that it appropriately sought to limit the scope of Mr. Scott's deposition because plaintiffs included in their list of deposition topics matters that were irrelevant to the present case. Def.'s Opp'n at 8.  The government asserts that the "substantive" issues in this case are limited to "plaintiffs' entitlement to a refund in connection with the foreign tax credit associated with UK tax paid with respect to income from PELLP." *Id.*  It contends that "Mr. Scott's personal opinions, impressions, conclusions and reasoning with respect to the Herrmanns' tax liability" are not relevant to the court's *de novo* review of these issues. *Id.*  The government acknowledges that, in connection with Count Four, plaintiffs are entitled to discovery, including Mr. Scott's testimony, on the limited issue of "whether [Ms.] Herrmann was excluded from participating in the audit of PELLP." *Id.* at 9.  On February 17, 2016, government counsel indicated that the IRS would authorize Mr. Scott to be deposed on this limited issue and offered six possible deposition dates. *Id.* at A-10.

Central to the government's arguments in this respect is its use of Treasury Regulations §§ 301.9000-1 to 301.9000-7 as a means of imposing these limitations on Mr. Scott's deposition.  The government asserts that "[q]uite simply, Mr. Scott may only testify if he receives the

appropriate testimonial authorization" from the IRS, as dictated by these regulations.  Def.'s Opp'n at 16.  According to the government, "[t]his authorization is necessary to ensure that the officer or employee [whose testimony is sought] will comply with all applicable law concerning the disclosure of return information (I.R.C. § 6103) and to give the agency the opportunity to assert any privileges." *Id.* at 17.  To some extent, at the hearing the government backed away from its categorical position that the IRS could block Mr. Scott's deposition testimony on certain issues: "[O]verall what we're arguing . . . is relevancy.  We're not trying to say Mr. Scott . . . cannot testify solely because the IRS won't authorize him to testify." Hr'g Tr. 40:6-11.  Thus, the question here is whether the government properly used the IRS's testimony-authorization process prospectively to limit the scope of Mr. Scott's deposition based on its relevancy objections.  The court concludes that it misused that process.

As a general rule, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . .  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." RCFC 26(b)(1).  As part of its discovery efforts, "[a] party may, by oral questions, depose *any* person, without leave of court," unless that person is confined in prison, or (1) "the deposition would result in more than 10 depositions being taken under this rule," (2) the person "has already been deposed in the case," or (3) the deposition is sought before the time specified in the Rules.  RCFC 30(a) (emphasis added).  A party wishing to take a person's deposition "must give reasonable written notice to every other party," including the "time and place of the deposition" and "the deponent's name and address." RCFC 30(b)(1).  Notices under RCFC 30(b)(1) are not required to include a list of deposition topics for the deponent or opposing party to review in advance of the deposition; the rules only require such a list when a notice or subpoena is directed to an organization, in which case the requesting party must "describe with reasonable particularity the matters for examination." RCFC 30(b)(6).  If a party has an objection during a deposition, "whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition," the objection "must be noted on the record, but the examination still proceeds. . . .  A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion [to terminate or limit a deposition on the ground of bad faith or unreasonable burden on the deponent or party]." RCFC 30(c)(2), (d)(3).

When the United States is a party to litigation, it is "subject to the rules of discovery" as is any other litigant. *Resource Invs.*, 93 Fed. Cl. at 379 (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 (1958)); *see also* 6 James Wm. Moore, *Moore's Fed. Practice* § 26.52[1] at 26-399 (3d ed. 2012) ("Discovery rules apply to the United States as a party just as fully as they apply to any other party." (citing *Proctor & Gamble*)).  This means that the government, as a litigant, cannot use its executive power to "dictate what evidence is admissible in a court of law, or whose testimony the court may hear." *Resource Invs.*, 93 Fed. Cl. at 379; *see also Gulf Grp. Gen. Enters. Co. v. United States*, 98 Fed. Cl. 639, 646 (2011) ("When the United States is a party to litigation, 'judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.'" (quoting *United States v. Reynolds*, 345 U.S. 1, 9-10 (1953))).

Relatedly, executive agencies cannot impose regulations that "contravene or otherwise impede the operation of the Federal Rules [of Civil Procedure and Evidence] or the Rules of the Court [of Federal Claims]" unless there is "clear congressional intent" because the procedural rules have "the force and effect of law." *Resource Invs.*, 93 Fed. Cl. at 379 (quoting *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183-84 (Fed. Cir. 1993)); *see also* 28 U.S.C. § 2072(b) ("All laws in conflict with [the Federal Rules of Civil Procedure and Evidence] shall be of no further force or effect after such rules have taken effect."); 28 U.S.C. § 2503(b) ("The proceedings of the Court of Federal Claims shall be in accordance with such rules of practice and procedure (other than the rules of evidence) as the Court of Federal Claims may prescribe and in accordance with the Federal Rules of Evidence."). Agency regulations limiting disclosure of information in legal proceedings, in contravention of the Federal Rules of Civil Procedure and Evidence and this court's rules, have consistently been found to be devoid of effect in cases where the United States is a party to the litigation. *See Resource Invs.*, 93 Fed. Cl. at 380 ("With near unanimity, however, those courts considering the issue have concluded that, when the United States is a party to the litigation, the reach of disclosure-limiting . . . regulations ends at the courthouse doors." (collecting cases)); *see also Gulf Grp.*, 98 Fed. Cl. at 646 (citing *Resource Investments* for this proposition); *Romero v. United States*, 153 F.R.D. 649, 652 (D. Colo. 1994) ("[T]he [g]overnment [as a party to the case] cannot use [an Army] regulation to gain an unfair advantage in precluding the best evidence from being presented to this [c]ourt at trial."); *cf. Moore's Federal Practice* § 26.52[1] at 26-400 ("Courts have been more willing to find government privilege [such as privilege for state secrets or deliberative process] when the government is not a party to the action.").

Executive agencies have nevertheless attempted to manage the disclosure of information during the discovery process by adopting and implementing regulations that limit what information can be released and who can provide such information. As a basis for these regulations, agencies have cited the "Housekeeping Act" of 1789, codified as amended at 5 U.S.C. § 301, which states in part: "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." *See* 26A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5682 at 190 (1992). The Supreme Court reviewed an agency's use of this statute to promulgate disclosure-limiting regulations in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). In *Touhy*, a trial court had found an agent of the Federal Bureau of Investigation ("FBI") guilty of contempt because he refused to produce subpoenaed papers "based upon on a regulation issued by the Attorney General under [the Housekeeping Act]." 340 U.S. at 463-64. The regulation stated that all Department of Justice "files, documents, records and information" were "confidential" and that no employee could disclose this information for any purpose other than performance of official duties without permission by the Attorney General or his designee. *Id.* at 463 n.1. The Supreme Court granted certiorari "to determine the validity of" this regulation, and specifically whether "it is permissible for the Attorney General to make a conclusive determination not to produce records and whether his subordinates in accordance with the order may lawfully decline to produce them in response to a subpoena *duces tecum*." *Id.* at 466-67. The Court found the regulation was "consistent" with the then-existing version of the Housekeeping Act, and therefore valid. *Id.* at 467-69. However, the Court expressly declined to rule on the constitutionality of the Attorney General's

13

purported ability to withhold information from the judiciary, since it was the FBI agent and not the Attorney General himself who refused to produce the documents. *Id.* (noting that the petitioner cited *Marbury v. Madison*, 1 Cranch 137 (1803) for the proposition that "the Executive should not invade the Judicial sphere").

In 1958, seven years after the *Touhy* decision, Congress amended the Housekeeping Act to add the following sentence: "This section does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301; *see also Gulf Grp.*, 98 Fed. Cl. at 644 (noting that the sentence was added "in response to the *Touhy* decision"). This amendment, the enactment of the Federal Rules of Evidence (which delineate privileges), and subsequent decisions undermined agencies' ability to claim a privilege to withhold information in legal proceedings based on so-called *Touhy* regulations. *See Moore's Federal Practice* § 26.52[6][f] at 26-418 ("Neither the [Housekeeping Act's] text nor its legislative history permits agency heads to withhold documents or testimony from discovery, irrespective of whether the government is a party to the suit." (citing *Exxon Shipping Co. v. Dep't of Interior*, 34 F.3d 774, 777-78 (9th Cir. 1994))); *see also Federal Practice & Procedure: Evidence* § 5682 at 206 ("The writers and the better reasoned cases now agree that the housekeeping privilege is defunct."); *Gulf Grp.*, 98 Fed. Cl. at 644 (discussing the 1958 amendment and its effect); *Resource Invs.*, 93 Fed. Cl. at 380 (same).

Many agencies have maintained certain regulations that, at a minimum, provide *internal* constraints on the disclosure of information during legal proceedings. For the IRS, these regulations can be found at Treasury Regulations § 301.9000-1 to -7. These regulations cite the Housekeeping Act, 5 U.S.C. § 301, as the authority under which they were promulgated, in addition to 26 U.S.C. § 7805, which is the Treasury Department's general mandate to "prescribe all needful rules and regulations for the enforcement of [the Internal Revenue Code]." *See* Testimony or Production of Records in a Court or Other Proceeding, 70 Fed. Reg. 7396-01 (Feb. 14, 2005).

Relevant to this dispute, Treasury Regulation § 301.9000-3(a) states that, with certain exceptions not applicable here, "when a request or demand for IRS records or information is made, no IRS officer, employee or contractor shall testify or disclose IRS records or information to any court . . . without a testimony authorization." Section 301.9000-2 sets out "[c]onsiderations in responding to a request or demand for IRS records of information." Subsection 301.9000-2(a) states that disclosure "shall not be authorized" when it would:

   (1) Violate a Federal statute including, but not limited to, sections 6103 or 6105 of the Internal Revenue Code . . . , the Privacy Act of 1974 (5 U.S.C. 552a), or a rule of procedure, such as the grand jury secrecy rule, Fed. R. Crim. P. 6(e);

   (2) Violate a specific Federal regulation, including, but not limited to, 31 CFR 103.53;

   (3) Reveal classified national security information, unless proper[l]y declassified;

   (4) Reveal the identity of an informant; or

   (5) Reveal investigatory records or information compiled for law enforcement purposes that would permit interference with law enforcement proceedings or

would disclose investigative techniques and procedures, the effectiveness of which could thereby be impaired.

Treas. Reg. § 301.9000-2(a). Subsection (b) states that the IRS may assert privileges in response to a request for testimony, including the "[a]ttorney-client privilege," the "[a]ttorney work product doctrine," and the "[d]eliberative process (executive) privilege." *Id.* § 301.9000-2(b). Subsection (c) lists 14 "additional factors" which authorizing officials will consider when responding to a request for "information in connection with a *non-IRS matter*," including the "importance of the legal issues presented" and "[w]hether the testimony or disclosure is appropriate under the rules of procedure governing the case or matter in which the request or demand arises." *Id.* § 301.9000-2(c) (emphasis added).

Treasury Regulation § 301.9000-4 sets out the procedures to be followed by IRS employees when they receive an information request "in matters in which a testimony authorization may be required," including United States Tax Court cases. Treas. Reg. § 301.9000-4(b), (c). However, Subsection (i) of this Section states that "[n]othing in these regulations creates a separate privilege or basis to withhold IRS records or information." *Id.* § 301.9000-4(i). Section 301.9000-5 of these regulations sets out the information that must be included in a written statement related to a request for information in "non-IRS matters." *Id.* § 301.9000-5. Finally, Section 301.9000-6 provides examples to "illustrate" how the preceding regulations would be applied. Example 6 discusses a situation similar to the one at issue here:

> In response to a request by the taxpayer's counsel to interview an IRS revenue agent who was involved in a case at the administrative level, the United States Department of Justice attorney representing the IRS in a suit for refund asks that the IRS revenue agent be made available to be interviewed. This is an IRS matter. A testimony authorization would be required for the IRS agent to testify because the testimony was first requested by taxpayer's counsel.

*Id.* § 301.9000-6; *see also* Def.'s Opp'n at 18 (identifying this example as "the most salient portion of the regulations").

Example 6 lists two factors relevant to the present case. First, the regulation would require a testimony authorization for Mr. Scott to be deposed "because the testimony was first requested by taxpayer's counsel." Treas. Reg. § 301.9000-6. The wording of this example suggests that it is the Department of Justice attorney's responsibility to obtain such an authorization, since this attorney is "representing the IRS in a suit" and "ask[ing] that the IRS revenue agent be made available to be interviewed." *Id.* Second, the example establishes that the present case is an "IRS matter" within the Treasury Regulations' definition. *Id.* This means that plaintiffs do not need to submit a written statement in support of the testimony authorization, pursuant to Treas. Reg. § 301.9000-5, nor does the IRS need to consider the 14 additional factors listed in § 301.9000-2(c) to determine whether to authorize Mr. Scott to discuss certain information during his deposition. In fact, Section 301.9000-2 of the regulations suggests that in IRS matters such as the instant case, the only bases to withhold testimony authorization are the situations listed in Subsection (a) – when disclosure of the information would violate a statute, rule of procedure, or regulation; reveal classified information or the identity of an informant; or

interfere with law enforcement proceedings, *id.* § 301.9000-2(a) – or when the information is subject to a privilege asserted by the IRS, *id.* § 301.9000-2(b).

Here, the government has not alleged that testimony during Mr. Scott's deposition would lead to one of the prohibited situations in Treasury Regulation § 301.9000-2(a). Correlatively, the government has not asserted any privilege with regard to Mr. Scott's deposition that would be covered under Subsection (b) of the same regulation. Instead, the government alleges that Mr. Scott's deposition testimony would be irrelevant because this suit requires a *de novo* determination of the Herrmanns' tax liability. Def.'s Opp'n at 8-9. With regard to the specific deposition topics proposed by plaintiffs, the only other objections the government makes are to the formulation of the topics themselves, *e.g.*, that responding to Topic 1 would require Mr. Scott to admit the IRS excluded Ms. Herrmann from the PELLP audit, Def.'s Opp'n at 11, and that requiring Mr. Scott to testify about issues "already disposed of" by the court with regard to his prior declaration (Topic 5) would only serve to "embarrass or harass him," *id.* at 16. The cited Treasury Regulations provide no basis prospectively to limit the scope Mr. Scott's deposition testimony on these grounds by withholding a "testimony authorization." The government admits that the purpose of the IRS's testimony authorization process is "to ensure that the officer or employee will comply with all applicable law concerning the disclosure of return information (I.R.C. § 6103) and to give the agency the opportunity to assert any privileges." *Id.* at 17. The government has not demonstrated, nor has it even alleged, that any of these concerns are implicated by Mr. Scott's deposition.

In short, although the Treasury Regulations may place internal restrictions on Mr. Scott as an IRS employee, they have no bearing on this court's procedures under the RCFC or the Federal Rules of Evidence. *See Resource Invs.*, 93 Fed. Cl. at 380 ("[W]hen the United States is a party to the litigation, the reach of disclosure-limiting *Touhy* regulations ends at the courthouse doors."). The government may have valid objections to questions that the plaintiffs intend to ask Mr. Scott during his deposition. Any objections to the relevancy or formulation of the plaintiffs' questions to Mr. Scott can be raised by the government during Mr. Scott's deposition and preserved on the record. *See* RCFC 30(c)(2); *see also, e.g.*, *Boston Edison*, 75 Fed. Cl. at 563 ("To the extent that Boston Edison believes that the government's questions to [the deponent] during his deposition impinge on the work product doctrine or the attorney-client privilege, Boston Edison may make a proper objection.") The government may also present a motion under RCFC 30(d)(3) if it believes certain questions are intended to unreasonably annoy or embarrass Mr. Scott. *Id.* To allow the government to use the Treasury Regulations as a basis to limit Mr. Scott's testimony beyond the procedural safeguards already provided by the court's rules would be tantamount to creating "a separate privilege or basis to withhold IRS records or information," which the regulations themselves expressly prohibit. Treas. Reg. § 301.9000-4(i). Further, the court cannot and will not abdicate its control over evidence in this case "to the caprice of executive officers" seeking to impose limitations on the plaintiffs' fact-finding efforts. *Reynolds*, 345 U.S. at 9-10; *see also Gulf Grp.*, 98 Fed. Cl. at 646-47 ("It is the court's prerogative, as well as the court's duty and responsibility under the Federal Rules of Evidence and the [RCFC], to decide the factual and legal issues raised by the plaintiff's complaints, as well as to review objections to testimony when offered. The court will not abdicate its . . . authority in this regard.").

3.   *Whether the proposed deposition topics pertain to relevant information.*

Although the court has concluded that the government improperly sought prospectively to limit the scope of Mr. Scott's deposition based on the Treasury's *Touhy* regulations, the government's relevancy objections to the deposition topics have an independent standing and should be addressed at this juncture to avoid the need for further court intervention during or after Mr. Scott's deposition.  As discussed previously, defendant's primary objection to the topics proposed for Mr. Scott's deposition is that his "personal opinions, impressions, conclusions and reasoning with respect to the Herrmanns' tax liability" are irrelevant to the court's *de novo* review.  Def.'s Opp'n at 2, 8 (citing *Garity v. United States*, No. 9-72624, 1980 WL 1765 at *2 (E.D. Mich. May 20, 1980); *Detroit Screwmatic Co. v. United States*, 49 F.R.D. 77, 79 (S.D.N.Y. 1970)).  The government also objects to plaintiffs' formulation of some of the topics in a way that appears calculated to obtain Mr. Scott's admission to error on the part of the IRS.  *E.g.*, Def.'s Opp'n at 11 (asserting that the phrasing of Topic 1 assumes that Ms. Herrmann was excluded from the audit of PELLP, which the court notes she evidently was so excluded at least for a time, *see Herrmann*, 124 Fed. Cl. at 61 & n.8).

At the hearing, plaintiffs conceded that Mr. Scott's deposition testimony cannot bind the government or the IRS as an admission of error, and they asserted this was not their intent in the formulation of the deposition topics.  Hr'g Tr. at 6:17 to 7:20; *see also* Def.'s Opp'n at 12 (citing *Dickman v. Comm'r*, 465 U.S. 330, 343 (1984), *Dixon v. United States*, 381 U.S. 68, 72 (1965), and *Automobile Club of Michigan v. Comm'r*, 353 U.S. 180, 183-84 (1957), for the proposition that "[n]o IRS deponent can bind the United States to, or estop it from asserting, any particular legal argument at trial").  Plaintiffs also acknowledged that in a tax refund suit, the government is not bound by the IRS's previous determinations of tax liability and may change its theory of liability at any point in the case based on information it discovers, whether or not that information was before the IRS at the time the tax liability determination was made.  Hr'g Tr. at 6:17-22.  Accordingly, the precise formulation of plaintiffs' proposed deposition topics is not a concern in terms of whether the questions asked of Mr. Scott will ultimately seek relevant information.  If the government objects to the way a question is asked during the deposition – for example, if it is argumentative or harassing – it may object on the record or seek additional remedies at that time.  *See* RCFC 30(c)(2).

Regarding the deposition topics themselves, plaintiffs are seeking to depose Mr. Scott on any information that, based on his personal knowledge, was before the IRS with respect to (1) the audit of PELLP, including any determination of whether Ms. Herrmann was a partner and entitled to participate in the proceedings; (2) the resulting Notice of Computational Adjustment issued to the Herrmanns; (3) the Herrmanns' subsequent request for the Notice of Computational Adjustment to be revised; (4) PELLP's 2008 tax return, including any determination of whether it included a Schedule K-1 for Ms. Herrmann; and (5) Mr. Scott's declaration filed previously in this case.  Pls.' Mot. to Compel at 12.  The court concludes that these topics are reasonably crafted to discover relevant information.  This is not a situation akin to that in *Garity* – one of the two authorities cited by the government – in which the plaintiff was questioning the government's "motivation in issuing the [tax] assessments and the opinions of individual IRS agents regarding their propriety."  1980 WL 1765, at *2.  Plaintiffs instead are seeking to establish a record of what happened, from the IRS's perspective, with regard to their tax

assessment. This is wholly appropriate, particularly given the unusual posture of this case, where the Herrmanns will be entitled to a substantial refund of taxes paid for 2008, with the amount dependent upon resolution of whether the $18 million payment Ms. Herrmann received very early in 2009 was attributable to her role as a limited partner or instead in a capacity other than as a partner under I.R.C. § 707(a)(2), and then to application of foreign tax credit carryback or carryforward rules. *See Herrmann*, 124 Fed. Cl. at 69.

### B. *Motion to Compel the Production of IRS Documents*

1. *Whether plaintiffs' motion lacked a good faith attempt to confer to resolve the dispute.*

The government argues that the plaintiffs' motion to compel the production of documents is procedurally deficient because plaintiffs did not make a good faith effort to confer with the government to resolve the issue without court intervention, in contravention of RCFC 37(a)(1). Def.'s Opp'n at 22. The government avers that although plaintiffs' counsel sent the request for production of documents on May 15, 2015 and the parties conferred about the request in late June, "there was no additional substantive communication regarding the production of documents until Friday, March, 18, 2016 at 4:36 p.m." *Id.* Because the plaintiffs' motion to compel was filed on March 22, 2016, "two business days" after reinitiating the discussion about the production request, the government argues that plaintiffs did not make a good faith effort to resolve the dispute. *Id.*

RCFC 37(a)(1) does not specify an amount of time that parties must allow for dispute resolution before filing a motion to compel, nor does it outline a process for such discussions. In analyzing whether a party made a good faith effort to confer, "courts have looked to the deadline for the completion of discovery," with a preference for a motion to be "filed sufficiently in advance of the discovery deadline . . . to allow it to be heard by [the] court, and if granted, to allow the compelled discovery to be produced prior to the deadline." *New Orleans Reg'l Physician Hosp. Org., Inc. v. United States*, 122 Fed. Cl. 807, 816 (2015) (quoting *Hitkansut LLC v. United States*, 119 Fed. Cl. 40, 49 (2014)). The court will also look to whether the parties have had opportunities subsequent to the filing of the motion to resolve the discovery dispute, which would mitigate any harm caused by the lack of a reasonable discussion period prior to the motion. *Id.* at 817 (noting the court had stayed briefing on the motion to compel for four months, which allowed the parties additional time to resolve the dispute); *Northrop Grumman Corp. v. United States*, 75 Fed. Cl. 761, 764 (2007) (finding that the opposing party had an additional two weeks after the motion to prepare a response, and therefore "the purpose of Rule 37(a)'s notice requirement was not frustrated"). Taking these and other factors into consideration, this court has found RCFC 37(a)'s notice requirement to be satisfied when there was a week or less between the initiation of discussions and filing of a motion to compel. *New Orleans Reg'l*, 122 Fed. Cl. at 816 (seven days); *Northrop Grumman*, 75 Fed. Cl. at 764 (six days).

In this instance, the parties originally conferred about the discovery request on June 29, 2015, at which point the government agreed to produce only four documents. Def.'s Opp'n at 22; Pls.' Reply at 7. Plaintiffs contacted the government again on March 18, 2016, and the

parties discussed the issue on March 21st, at which point the government asked plaintiffs to wait until the close of business on March 22nd before filing a motion to compel.  Def.'s Opp'n at 22; Pls.' Reply at 8.  On March 22nd, the government produced 10 more documents in response to plaintiffs' request.  Def.'s Opp'n at 22; Pls.' Reply at 8.  At that point, it was reasonable for plaintiffs' counsel to believe that the government would not produce any further documents based on its prior objections and the discussions on the previous day.  In light of the fact that the deadline for discovery requests is June 17, 2016 and fact discovery is scheduled to close on July 18, 2016, it was appropriate for the plaintiffs to bring the discovery dispute to the court's attention to allow the court time to resolve the issue before discovery is scheduled to conclude. In addition, the court has granted the government's request for an enlargement of two weeks in which to respond to plaintiffs' motion, *see* Order of Apr. 4, 2016, ECF No. 44, giving the parties a total of one month to continue their efforts to resolve the discovery dispute, if they so desired. Accordingly, the court concludes that the notice requirement of RCFC 37(a)(1) has been met under the circumstances.

2. *Whether the requested documents are relevant.*

The government claims that the production requests in dispute (Requests 1, 5, 6, 11, 13, and 14) pertain to "entirely irrelevant" information.  Def.'s Opp'n at 3-23.  To support this contention, the government cites *Vons Cos. v. United States*, 51 Fed. Cl. 1, 6 (2001), *abrogation on other grounds recognized by Alpha 1, L.P. ex rel. Sands v. United States,* 83 Fed. Cl. 279, 288 (2008), which stated that the "court's determination of plaintiff's tax liability must be based upon the facts and merits presented to the court and does not require (or even ordinarily permit) this court to review findings or a record previously developed at the administrative level." *Id.* at 6. Accordingly, the government asserts that "it would not be proper for this [c]ourt to consider any IRS records or evidence in reaching its independent determination of the merits of the [p]laintiffs' refund claim." Def.'s Opp'n at 24 (citing *Wells Fargo & Co. v. United States*, 91 Fed. Cl. 35, 75 (2010) ("In conducting a *de novo* review, the [c]ourt must give no weight to subsidiary factual findings made by the IRS in its internal administrative proceedings."), *aff'd*, 641 F.3d 1319 (Fed. Cir. 2011)).

Nonetheless, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  RCFC 26(b)(1).  The information sought during discovery "need not be admissible at trial" as long as the request "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*  Under the Federal Rules of Evidence, information is relevant if (1) "it has any tendency to make a fact more or less probable than it would be without the [information]," and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401.  In determining whether information is "relevant to any party's claim or defense," the court looks to "the specific claim or defense alleged in the pleadings," although "a particular fact need not 'be alleged in a pleading for a party to be entitled to discovery of information concerning the fact.'" *System Fuels, Inc. v. United States*, 73 Fed. Cl. 206, 215 (2006) (quoting 6 James Wm. Moore, *Moore's Fed. Practice* § 26.41[2][a] at 26-109 to -110 (3d ed. 2003)).  A trial court has significant discretion in directing the "scope and conduct of discovery," and motions for a protective order and to compel discovery "are both committed to that discretion." *Vons Cos.*, 51 Fed. Cl. at 5 (quoting *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984)).  A "court must be careful not to deprive a party of discovery that

is reasonably necessary to afford a fair opportunity to develop and prepare the case." *Id.* (quoting *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1024 (Fed. Cir. 1986) (in turn quoting Fed. R. Civ. P. 26(b)(1))).  Although "some degree of fishing is anticipated by the Federal discovery rules, those rules do not sanction a party to employ essentially a purse seine that indiscriminately sweeps in not only relevant catch, but hosts of irrelevant and protected species of information."  *Id.* at 24-25 (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.")).

To a certain extent, the government misapprehends the relevant inquiry at this stage in the case by asserting that IRS records are not relevant to the court's *de novo* determination of the Herrmanns' tax liability.  The Herrmanns seemingly did not have an opportunity to participate fully in the IRS's audit of PELLP.  The Schedule K-1 for 2008 belatedly received by Ms. Herrmann contained an evident error in its statement of foreign source income (assuming the $18 million payment at issue was partnership income), and the corrected Schedule K-1 Ms. Herrmann ultimately received was not taken into account in the IRS's Notice of Computational Adjustment and Notice of Tax Due.  The Herrmanns are seeking to discover this information in their pursuit to uncover all the relevant facts and information considered by the IRS in *its* determination of their tax liability.  Count Four of the complaint remains at issue.  *See Herrmann*, 124 Fed. Cl. at 68.  The pertinent question is whether the requested documents are relevant to any of the Herrmanns' claims or the government's potential defenses in this case, based on the "claim[s] or defense[s] alleged in the pleadings."  RCFC 26(b)(1); *System Fuels*, 73 Fed. Cl. at 215.  Both parties have cited numerous cases that purportedly support their competing assertions that IRS records, and specifically those comprising a taxpayer's "administrative file," are or are not relevant to a tax refund suit such as the present case.  Pls.' Mot. to Compel at 8-11 & Ex. 3 at 3 & n.1; Def.'s Opp'n at 2-3, 23-24.[9]

The government relies on *Vons Cos.* and *Wells Fargo* in its relevancy objections to plaintiffs' document requests.  *See, e.g.*, Def.'s Opp'n at 23-24 (citing *Vons Cos.* and *Wells Fargo* in its discussion of Request 1).  In *Vons Cos.*, Judge Allegra of this court considered a tax refund claim in which Vons asserted that IRS Revenue Ruling 76-28 and the IRS's historical application of this ruling in relation to other sections of the I.R.C. created a precedent allowing

---

[9]A court has described a taxpayer's IRS administrative file as

> a compilation of information used in variety of internal agency procedures,
> including the establishment of assessments, as well the processing of refund
> claims and refund suits.  More than a thousand provisions of the [IRS's] Manual
> discuss the contents, uses and handling of this file.  The provision that describes
> the use of the file in processing refund suits contains a checklist of the documents
> normally included in the administrative file, such as: tax returns, claims for
> refund, the revenue agents' reports on any original examination of the tax year in
> question, as well as on the refund claim itself, any IRS Appeals Division Reports
> regarding the tax year, and a detailed transcript of the taxpayer's account.

*Cook v. United States*, 46 Fed. Cl. 110, 112 n.2 (2000).

certain deductions for contributions to pension plans. 51 Fed. Cl. at 4. The plaintiff's extensive discovery requests in this regard included "various IRS and Treasury Department files relating to Revenue Ruling 76-28, as well as files relating to sixteen identified private letter rulings, technical advice memoranda and General Counsel memoranda, . . . and all other documents relating to the ongoing consideration, reconsideration, development, interpretation or application of Revenue Ruling 76-28 and the other cited IRS administrative materials." *Id.* The government argued "that plaintiff is not conducting fact discovery, but instead is attempting to bolster purely legal arguments by seeking discovery of legal matters, including the IRS' internal view of the law." *Id.* at 4-5. It was in this context that Judge Allegra made the statement, quoted several times by the government in the present case, that the "court's determination of plaintiff's tax liability must be based upon the facts and merits presented to the court and does not require (or even ordinarily permit) this court to review findings or a record previously developed at the administrative level." *Id.* at 6. In deciding plaintiff's motion to compel production of the requested documents, the court noted that the "files requested by plaintiff [pertaining to Revenue Ruling 76-28] will be relevant in this action only in very limited circumstances" because they could contain, for example, "memoranda from individual IRS line attorneys setting forth positions that do not represent the agency's formal view of the law." *Id.* at 21. Nevertheless, the court concluded that "some of these materials may be relevant and thus potentially discoverable," subject to certain privileges the IRS potentially could assert. *Id.*

The government also cites *Wells Fargo* to support its contentions: "In conducting a *de novo* review, the [c]ourt must give 'no weight . . . to subsidiary factual findings made by the [IRS] in its internal administrative proceedings.'" Def.'s Opp'n at 24 (citing *Wells Fargo*, 91 Fed. Cl. at 75 (quoting *D'Avanzo v. United States*, 54 Fed. Cl. 183, 186 (2002) (in turn quoting *Cook*, 46 Fed. Cl. at 113))). The cited decision in *Wells Fargo* did not involve a discovery dispute; the court made this statement in the context of briefly noting that tax refund suits are *de novo* proceedings in which no deference is given to the IRS's prior determination of tax liability. *Wells Fargo*, 91 Fed. Cl. at 75. Instructively, the underlying decision in *Cook* – like *Vons Cos.*, issued by Judge Allegra – did involve a motion to compel the production of documents in a tax refund suit. *Cook*, 46 Fed. Cl. at 112-13. Perhaps ironically, the Herrmanns cite *Cook* in their motion to compel for the proposition that a taxpayer's administrative file *is* relevant and discoverable in a refund suit. Pls.' Mot. to Compel at 19. In *Cook*, the taxpayer sought the production of documents from his IRS administrative file, but the government had somehow lost this file. 46 Fed. Cl. at 112. Again, the cited statement in *Cook* was made in the context of explaining the *de novo* proceedings and that, conversely, there is a "presumption of correctness" associated with the IRS's prior determination of tax liability, placing "an obligation on the taxpayer to come forward with evidence to rebut this presumption." *Id.* at 113-14 (citing *United States v. Janis*, 428 U.S. 433, 440-41 (1976); *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)). Although this presumption may prevent the court, in most cases, from "looking behind the Commissioner's determination," there is no such rule that plaintiffs are prevented from doing so as part of their discovery efforts. *Id.* at 114. In fact, the court in *Cook* suggested that because the plaintiff ordinarily has the burden of proving that the IRS's determination was incorrect, the records surrounding that determination would likewise be discoverable, if not necessarily admissible. *See id.* at 115-16 (discussing the taxpayer's burden of proof); *id.* at 120 ("[T]his court believes that the [IRS] has a particular responsibility to ensure that files needed for litigation are preserved and timely made available to the Justice Department and, upon proper

discovery request, to plaintiffs.  While in this seemingly isolated case, the law limits the ramifications of the [IRS's] failure to preserve its administrative records, broader relief might be appropriate were it determined that the problem in preserving records were pervasive and systematic.")  Accordingly, the court ordered the government to "produce all documents in its possession, which are not privileged, and regardless of whether copies of such documents were originally contained in the administrative file for this case, responsive to [certain document requests]."  *Id.* at 120.[10]

Contrary to the government's assertions, the decisions in *Vons Cos.* and *Wells Fargo* at most establish that this court owes no deference to the IRS's prior determination of a taxpayer's liability, aside from a presumption of correctness which the plaintiffs must overcome.  *See Cook*, 46 Fed. Cl. at 113.  This does not prevent the Herrmanns from discovering information and records used by the IRS in making its determination of their tax liability before, during, and after the audit of PELLP.  And that is especially true when a plaintiff alleges a violation of law regarding notice and opportunity to be heard, as here.  *See Herrmann*, 124 Fed. Cl. at 68. Indeed, under the standards of RCFC 26(b)(1), this information is not only relevant to the Herrmanns' claims, but also may well be relevant to the government's defenses.  To paraphrase the discovery requests at issue, the Herrmanns are looking to discover information that was before the IRS with respect to (1) the Notice of Computational Adjustment and the Herrmanns' subsequent effort to obtain a revision of it (Requests 2 and 5); (2) the assessment of the Herrmanns' tax liability, including any additional calculations based on the revised 2008 PELLP Schedule K-1 (Request 6); and the audit of PELLP (Requests 11, 13, and 14).  These requests are aimed at developing a record of the Herrmanns' tax assessment, which is completely appropriate at this stage in the litigation.[11]

---

[10]In some circumstances, the burden of proof concerning "the liability of the taxpayer for any tax imposed by subtitle A or B[, classified to I.R.C. § 1, et seq. and § 2001, et seq., reverses and], the Secretary [of the Treasury] shall have the burden of proof."  I.R.C. § 7491(a)(1). Among other things, to shift the burden to the government, this statute requires the taxpayer to come forward with "credible evidence."  *Id.*; *see Stobie Creek Invs. v. United States*, 82 Fed. Cl. 636, 663 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010).  "Additionally, an IRS assessment will be presumed correct unless it is 'naked,' that is 'arbitrary in the sense that the calculation has no support and the true amount of tax owed is incapable of being ascertained.'"  *Heger v. United States*, 103 Fed. Cl. 261, 265 (2012) (quoting *Cencast Servs., L.P. v. United States*, 94 Fed. Cl. 425, 453 (2010) (in turn quoting *United States v. Schroeder*, 900 F.2d 1144, 1149 (7th Cir. 1990)), *aff'd*, 729 F.3d 1352 (Fed. Cir. 2013)); *see also Jenkins v. United States*, 101 Fed. Cl. 122, 130 (2011) (Allegra, J.) (noting that while the loss by the IRS of a taxpayer's file "did not shift the burden of proof . . . , it did require [the government] to show that a *prima facie* case for the assessment . . . existed, *i.e.*, that the assessment was not naked."), *aff'd*, 484 Fed. Appx. 511 (Fed. Cir. 2012).

[11]To the extent that the government also continues to maintain that these requests are "vague" or "overbroad," the court disagrees.

## C.  *Production of Documents from Paulson*

Plaintiffs' motion to compel document production from Paulson can be narrowed to two issues: (1) disclosure of information related to compensation and ownership interests of certain individuals associated with Paulson, and (2) identification of redactions based on attorney-client privilege.

### 1.  *Disclosure of compensation and ownership information.*

Paulson asserts that plaintiffs' requests for information about the compensation and ownership interests of its employees is unreasonable and unduly burdensome under the "proportionality" considerations applied by this court to discovery requests directed to nonparties.  Paulson's Cross-Mot. at 7-8 (citing *Hitkansut*, 119 Fed. Cl. at 45).  Among other things, the court will limit the discovery of information when "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  RCFC 26(b)(2)(C)(iii).  "The court in its determination of whether to allow discovery must balance need against burden, confidentiality, and harm."  *Hitkansut*, 119 Fed. Cl. at 47.  The court will also consider whether the discovery in question is sought from a nonparty, where a lower threshold applies for establishing an undue burden.  *Id.*; *see also Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) ("[T]he fact of nonparty status may be considered by the court in weighing the burdens imposed in the circumstances [of a discovery request].")  In essence, Paulson argues that because the compensation and ownership information is highly sensitive, plaintiffs must show a compelling need for this information in the present case.  Paulson's Cross-Mot. at 13-15.  As Paulson would have it, it has already provided plaintiffs the only information essential to establishing whether the $18 million payment at issue was made to Ms. Herrmann in her capacity other than as a partner of PELLP – the details of *Ms. Herrmann's* compensation for the relevant years, including how it was determined.  *Id.* at 14.  Paulson asserts that information about other employees' compensation would accordingly have little "probative value" as to the method or terms of Ms. Herrmann's compensation and that the potential benefit of this disclosure does not outweigh the potential harm.  *Id.* at 15-16.

Paulson and its employees have valid interests in preserving privacy, but many of these concerns are ameliorated by the protective order previously entered in this case at Paulson's behest to protect private and confidential information.  *See* Protective Order (Mar. 31, 2016), ECF No. 42.  In other respects, although Ms. Herrmann's compensation arrangement may be unique to her, it appears from information presented to the court that her remuneration was not established in isolation from the compensation for other persons performing similar functions.  Specifically, Ms. Herrmann has had in her possession a document marked "Attachment A," purportedly from 2007, showing the base salaries and discretionary bonus computations for Ms. Herrmann and certain other Paulson employees.  Hr'g Tr. at 78:15 to 80:18.  This document appears to show that discretionary bonuses for certain individuals were determined through a "profitability based formula" tied to the category of funds managed by the individual (*i.e.*, Merger & Event and Credit).  Hr'g Tr. at 79:20 to 80:18.  Similar documents from subsequent years could potentially show whether there was continuity in the formulation of Ms. Herrmanns'

compensation whether or not she was a partner, as well as how the formulation for her compared to other individuals who may or may not have been considered partners of PELLP or Paulson & Co.

The court proposed at the hearing to satisfy the "proportionality" considerations regarding discovery from nonparties through a compromise. First, the court has revised the protective order entered in this case to specify that information regarding the compensation and ownership interests of Paulson employees other than Ms. Herrmann will be limited to attorneys' eyes only – in other words, the information may not be shared with the Herrmanns. Order of May 18, 2016, ECF No. 54. Second, Paulson will respond to the Herrmanns' document production requests by providing compensation information for two partners from PELLP, and two individuals of Paulson's choosing who performed functions similar to Ms. Herrmann at Paulson & Co. in New York – one from the Merger & Event fund and one from the Credit fund. This information will encompass the years 2005 through 2009. Finally, Paulson may redact the names of all individuals from this information, providing instead designations such as "Employee A," "Employee B," and so forth. These limitations will allow both plaintiffs' counsel and the government to gain access to this information while circumscribing the potential harm to Paulson to the greatest extent possible. This approach is "workable" insofar as the plaintiffs and the government are concerned because it would provide a comparative baseline for the relevant years and enable the parties to address effectively the central issue in the case, *i.e.*, whether Ms. Herrmann received the $18 million payment as a partner or in a capacity other than as a partner. Hr'g Tr. 99:3; *see also* Hr'g Tr. 93:12 to 107:23. It simultaneously endeavors to preserve Paulson's interests in the confidentiality of its operations. *See* Hr'g Tr. 103:9 to 107:23.

Accordingly, Paulson is ordered to provide to plaintiffs unredacted versions of the documents previously provided, as well as any other documents withheld in response to Requests 9, 10, and 11, subject to the limitations and protections described in the preceding paragraph.

2. *Identification of information redacted based on privilege.*

Plaintiffs also contend that, to the extent that the remaining redactions in the documents provided are based on a privilege asserted by Paulson, Paulson must expressly make this claim and provide a "privilege log" describing the nature of the withheld information. Pls.' Paulson Mot. at 7; *see also* RCFC 26(b)(5)(A) (stating the requirements for asserting privilege during the discovery process). At the hearing, Paulson stated that the two redacted documents cited in plaintiffs' reply papers (presumably referring to the documents marked Paulson_00001482 and Paulson_00001487) were "redacted for attorney-client privilege." Hr'g Tr. at 86:14-16. Paulson also stated "[t]here is a small portion of documents that are still redacted. Some are for privilege and some relate to the three requests relating to the compensation of other partners." Hr'g Tr. at 86:17-20. To the extent that Paulson has redacted or withheld documents due to privilege, Paulson is ordered to expressly identify the privilege asserted and describe the nature of the documents in accord with RCFC 26(b)(5)(A).

**CONCLUSION**

For the reasons stated, the plaintiffs' motion to compel directed to the government is GRANTED.  The government shall submit a notice of compliance with this order by June 3, 2016.

Plaintiffs' motion to compel directed at Paulson is GRANTED IN PART and DENIED IN PART.  Paulson shall submit a notice of compliance consistent with the limitations specified in this order by June 3, 2016.

Paulson's cross-motion for a protective order is also GRANTED IN PART and DENIED IN PART.  The court has amended the protective order issued in this case as described in this opinion.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge