# In the United States Court of Federal Claims

No. 14-941T

(Filed Under Seal: June 12, 2017)

(Reissued: June 21, 2017)

| | |
|---|---|
| **JEFFREY W. HERRMANN and MINA GEROWIN HERRMANN,** | Post-trial decision in a tax refund case; timing of receipt of income; formulaic bonus paid to an American member of an English limited liability partnership in her capacity other than as a member; I.R.C. § 707(a)(2)(A) |
| **Plaintiffs,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant.** | |

Nathan E. Clukey, King & Spalding LLP, Washington, D.C., for plaintiffs.  With Mr. Clukey on the briefs and at trial were Abraham N.M. Shashy, Jr., and Ariana F. Wallizada, King & Spalding LLP, Washington, D.C.

Matthew D. Lucey, Trial Attorney, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant.  With Mr. Lucey on the briefs were David A. Hubbert, Acting Assistant Attorney General, Tax Division, David I. Pincus, Chief, Court of Federal Claims Section, G. Robson Stewart, Assistant Chief, Court of Federal Claims Section, and Blaine G. Saito, Trial Attorney, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C.

## ORDER[1]

LETTOW, Judge.

This post-trial opinion addresses a refund claim that turns on the timing of income received and taxes due on an $18,748,838 payment ("$18 million payment") to plaintiff Mina Gerowin Herrmann by her then-employer, Paulson Europe LLP ("PELLP"), based in London.  PELLP ordered the payment to be issued on December 31, 2008, but Ms. Herrmann did not receive it until January 6, 2009.  PELLP did not provide Ms. Herrmann with a tax reporting

---

[1]Because this order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this order and to provide proposed redactions of any confidential or proprietary information.  No redactions were requested.

document, *i.e.*, either a W-2 or a K-1, respecting the payment or any other income Ms. Herrmann received from PELLP during 2008.  For the 2008 U.S. tax year, Ms. Herrmann and her husband Jeffrey W. Herrmann (collectively, "the Herrmanns" or "plaintiffs") filed a U.S. tax return and paid taxes on the income they actually received in 2008 but not on the $18 million payment.

The Herrmanns, who are U.S. citizens resident in London, paid taxes on the $18 million payment to the U.K. in 2009 at a higher rate than the applicable U.S. tax rate for such a payment.  Following an audit of PELLP, the Internal Revenue Service ("IRS" or "government") determined that this payment was a partnership distribution to Ms. Herrmann and should have been reported on the Herrmanns' U.S. federal income tax return for 2008.  The IRS therefore determined that the Herrmanns owed $7,860,434.87 in taxes plus interest for the 2008 tax year.  The Herrmanns paid this amount to the IRS and filed a refund claim, alleging that they had been subjected to double taxation on the $18 million payment.  The Herrmanns specifically contend that the $18 million payment was not a partnership distribution, either because Ms. Herrmann was not a *bona fide* partner in PELLP or because the payment was for services rendered outside her capacity as a partner.  The Herrmanns further argue that if the $18 million payment were deemed a partnership distribution, they should be able to elect the accrual method of accounting for foreign tax credit purposes for the 2008 U.S. tax year.  Additionally, the Herrmanns aver that the Notice of Computational Adjustment issued to them by the IRS during the audit of PELLP violated certain provisions of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324 (1982) (codified at 26 U.S.C. (Internal Revenue Code or "I.R.C.") §§ 6221-6234), and therefore is invalid.  Finally, if the court determines that the Herrmanns were and are required to report the $18 million payment on their 2008 U.S. tax return, the Herrmanns claim that they are entitled to a substantial partial refund because foreign tax credits for taxes paid to the U.K. in 2009 can and must be carried back to the 2008 tax year.

A six-day trial was held in Washington, D.C., commencing on January 23, 2017 and ending on January 30, 2017.  Following post-trial briefing, the court heard closing arguments on May 23, 2017.  The case is now ready for disposition.

## FACTS[2]

### *A. Ms. Herrmann's Role at Paulson & Co. and PELLP*

In January 2005, Ms. Herrmann joined Paulson & Co., Inc. ("Paulson & Co.") as a senior analyst in its New York office.  Tr. 869:4-10, 910:24-25 (Test. of Mina Gerowin Herrmann).[3]  At that time, the Herrmanns resided in New Rochelle, New York.  Tr. 692:19-21 (Test. of Jeffrey Herrmann).  Paulson & Co. is an investment management firm organized as an S corporation

---

[2]This recitation of facts constitutes the court's principal findings of fact in accord with RCFC 52(a).  Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[3]Citations to the trial transcript are cited as "Tr. __."  Citations to joint exhibits are marked as "JX __," plaintiff's exhibits are identified as "PX __," and defendant's exhibits are denoted as "DX __."

under U.S. law and is entirely owned by John Paulson. Tr. 474:13-20, 475:22-25 (Test. of John Paulson). At the time of trial, Paulson & Co. managed about $10 billion in various hedge funds, including merger arbitrage funds, event arbitrage funds, and credit funds. *See, e.g.*, JX 43 (Paulson & Co., Inc., The 2007 Paulson Funds Annual Review (Nov. 29, 2007)) at J-43_0002; Tr. 476:4-5 (Paulson). When Ms. Herrmann joined Paulson & Co., her role was to analyze investment opportunities for the Paulson & Co. funds and propose viable opportunities to Mr. Paulson. *See* Tr. 870:21 to 871:13 (M. Herrmann). She initially worked on the merger funds, but later shifted her focus to include the event funds as well. Tr. 871:7-9 (M. Herrmann). Ms. Herrmann worked for Paulson & Co. on an at-will basis, and initially received a base salary of $300,000 per year and a guaranteed bonus of $125,000 in her first year of employment. JX 18 (Letter from Dennis Pollack, Chief Operating Officer, Paulson & Co. to Mina Gerowin (Jan. 1, 2005)); Tr. 869:15-17, 870:15-20 (M. Herrmann). Following the first year, Ms. Herrmann's bonus was discretionary and determined by Mr. Paulson. Tr. 869:21-24 (M. Herrmann). Ms. Herrmann was promoted to senior vice president in 2006, which expanded her role to include meetings and presentations with investors. *See* JX 42 (Paulson & Co., Inc., The 2006 Paulson Funds Annual Review (Nov. 30, 2006)) at J-42_0004; Tr. 877:12-25 (M. Herrmann). She also received a salary increase to $350,000 and continued to receive a discretionary bonus. Tr. 878:20-24 (M. Herrmann).

In 2007, Mr. Paulson changed Ms. Herrmann's bonus compensation from discretionary to formulaic. *See* Tr. 884:21 to 885:3 (M. Herrmann). She "received 2 percent of the net incentive fee" paid to Paulson & Co. for the merger and event funds rather than receiving a bonus determined exclusively at the discretion of Mr. Paulson. *See* JX 1 (Paulson & Co. and Affiliates Compensation Summary) at J-1_0001; Tr. 883:24 to 884:20 (M. Herrmann).[4] Mr. Paulson established the formula to be used to calculate Ms. Herrmann's bonus, but once the formula was set he did not determine any amount of the bonus. *See* Tr. 492:9-12, 503:4-7 (Paulson). Since the formulaic bonus was tied to the performance of the merger and event funds, Ms. Herrmann would not have received a bonus if gains were not realized on the investments in those funds. *See* Tr. 503:8-11 (Paulson); Tr. 901:4-12 (M. Herrmann).

Although Paulson & Co.'s senior managers who received formulaic bonuses were employees, Mr. Paulson considered those employees to be "partners" in the company. Tr. 885:4-13 (M. Herrmann); *see also* Tr. 491:8-11 (Paulson) ("Well, as people became senior, they became partners of the firm, and then they would participate in the profitability of the firm according to a specific formula."). Because Paulson & Co. is a corporation, not a partnership, the participating individuals who received formulaic bonuses, including Ms. Herrmann, were partners in name only. Ms. Herrmann's income from Paulson & Co., including both her fixed salary payment and her bonus, was reported to the IRS on a W-2, reflecting her status as an employee of Paulson & Co. Tr. 328:4-6 (Test. of Christopher Bodak, Chief Financial Officer of Paulson & Co.).

---

[4]The net incentive fee is "generally 20 percent of the gains realized on the investment" in each Paulson & Co. fund. Tr. 483:19-21 (Paulson). Thus, Ms. Herrmann's two percent of the incentive fee equaled four-tenths of a percent of the total fund pool. *See* Tr. 884:14-19 (M. Herrmann).

In January 2008, Ms. Herrmann transferred to Paulson & Co.'s European affiliate, PELLP, and the Herrmanns moved to London. *See* Tr. 692:22 to 693:18 (J. Herrmann); Tr. 889:13 to 890:10 (M. Herrmann). Ms. Herrmann's job responsibilities and compensation did not change upon transferring to PELLP, although she did focus more on European investments for the merger and event funds rather than U.S. investments. *See* Tr. 494:1-21 (Paulson); Tr. 892:25 to 894:13 (M. Herrmann). Additionally, at some point after transferring to PELLP, Ms. Herrmann's title changed from senior vice president to managing director. *See* JX 44 (Paulson & Co., Inc., The 2008 Paulson Funds Annual Review (Nov. 17, 2008)) at J-44_0007; JX 17 (Business Cards for Mina Gerowin Herrmann) (listing Ms. Herrmann's title at PELLP as "Managing Director"); Tr. 892:18-24 (M. Herrmann).

Upon transferring to PELLP, Ms. Herrmann became a member of its partnership on January 8, 2008 by signing a deed of adherence and contributing £30,000. *See* PX 32 (Paulson Europe LLP Deed of Adherence). By signing the deed of adherence, Ms. Herrmann agreed to "observe and perform the terms and conditions of the [PELLP partnership a]greement." *Id.* The deed of adherence also stated that it was to be "supplemental to and read together with the [a]greement." *Id.* The deed of adherence identifies Paulson Ltd. as the "Corporate Member" of PELLP,[5] lists Nikolai Petchenikov and Harry St. John Cooper as members of PELLP, and identifies Ms. Herrmann as a "Further Member." *Id.* The deed of adherence did not provide Ms. Herrmann with voting rights in the partnership. *See id.*; *see also* Tr. 930:4-10 (M. Herrmann).

PELLP was and is "incorporated" under the law of England and Wales. JX 13 (Paulson Europe LLP Limited Liability Partnership Agreement) at J-13_0003. The partnership agreement, dated June 30, 2006, lists Paulson Ltd. and Mr. Petchenikov as "Designated Members" of PELLP and Mr. St. John Cooper as a "Member." *Id.* at J-13_0021.[6] The agreement designates 82% of voting rights to Paulson Ltd., 9% to Mr. Petchenikov, and 9% to Mr. St. John Cooper. *Id.* The agreement also explains:

> The [b]usiness of [PELLP] shall initially be to carry on the business of (1) managing on a discretionary basis the investment or trading of assets belonging to other persons or entities; (2) marketing and promoting shares or interests in such other persons or entities; and (3) activities associated therewith.

*Id.* at J-13_0007. PELLP members other than Paulson Ltd. were required "to devote [their] whole time and attention to [PELLP]" and could not engage in other business ventures without the consent of Paulson Ltd. *Id.* at J-13_0012. With regard to the allocation of partnership profits and losses, the agreement provides that Paulson Ltd. would determine the allocation of PELLP's profits and losses among the partnership members following the allocation of funds for other expenses of the partnership at the end of PELLP's fiscal year, March 31. *See id.* at J-13_0010 to

---

[5]Paulson Ltd. is 100 percent owned by Paulson & Co. Joint Stipulation ¶ 6, ECF No. 80; Tr. 313:21-25 (Bodak).

[6]Designated Members of PELLP are responsible for compliance with the United Kingdom Limited Liability Partnerships Act 2000, and have the authority to appoint and replace auditors. JX 13 at J-13_0016.

-11.  PELLP never made its own profits, however, because it "has no funds to invest.  It only ha[s] the money sent over from [Paulson & Co. in] New York to pay its costs and . . . formulaic bonuses and the staff salaries and employee things.  [PELLP] ha[s] no [other] funds."  Tr. 933:19-24 (M. Herrmann).

Ms. Herrmann did not expect to be asked to make a capital contribution or sign the deed of adherence, but she was told upon arriving in London that both were required as a condition of her employment at PELLP.  *See* Tr. 1009:11 to 1010:10 (M. Herrmann).  She did not see the partnership agreement before signing the deed of adherence, and she did not receive a copy of it until 2011.  *See* Tr. 930:24 to 931:21 (M. Herrmann).  During her time working at PELLP, Ms. Herrmann remained an at-will employee, she performed the same duties and received the same compensation as she had as an employee at Paulson & Co., and she stated at trial that she "had nothing to do with the profits and losses of [PELLP]."  Tr. 878:1-5, 892:18 to 893:4, 936:4-5 (M. Herrmann).  Ms. Herrmann understood that she had to become a member of PELLP so that PELLP could avoid certain U.K. employment tax obligations.  *See* Tr. 317:11-20 (Bodak); Tr. 921:3-17 (M. Herrmann); *see also* PX 267 (E-mail from Jeffrey Bortnick to Joseph Scott (Nov. 22, 2011)) at 2 (stating that PELLP paid National Insurance Tax to the U.K. on behalf of six employees, but did not pay any such tax on behalf of the "members/partners").

### B. The $18 Million Payment

On December 31, 2008, PELLP directed that the $18 million payment be made to Ms. Herrmann.  Joint Stipulation ¶ 18.  Paulson & Co. wired the necessary funds to PELLP for the $18 million payment, along with the funds for payments to Mr. Petchenikov and Mr. St. John Cooper, and PELLP in turn directed that money to the Herrmanns' bank.  *See* PX 314 (Brattle Group, Summary Exhibit) at 1; *see also* Tr. 911:9-13 (M. Herrmann) ("After Paulson ha[d] figured out your bonus, they would wire it to [PELLP].  Two, three days before year end, calendar year end, when the wire had cleared, [PELLP] would turn around and wire it to us.").  The Herrmanns' bank received the payment on January 5, 2009, and it was credited to the Herrmanns' joint account on January 6, 2009.  Joint Stipulation ¶ 18; *see also* JX 82 (IDR Request No. 7 issued to Jeffrey W. Herrmann and Mina Gerowin Herrmann (Sept. 28, 2011)) at J-82_0008.

The $18 million payment to Ms. Herrmann reflects 0.4% of the Paulson & Co. merger fund and event fund pool in 2008, which equals 2% of the net incentive fees paid to the funds for 2008.  *See* JX 54 (Paulson & Co. and Affiliates Incentive Fees) at J-54_0004.  The formula used to determine the $18 million payment was the same formula used to calculate Ms. Herrmann's bonus in 2007, when she was still employed by Paulson & Co., and in 2009, her second year at PELLP.  *See id.* at J-54_0003 to -05; Tr. 908:14 to 909:6 (M. Herrmann).

### C. Preparation of Plaintiffs' 2008 and 2009 Tax Returns

The Herrmanns engaged Frank Hirth PLC ("Frank Hirth") for assistance in preparing their 2008 U.S. federal tax return.  *See* Tr. 64:2-6 (Test. of Paul Hocking); Tr. 699:23 to 700:1 (J. Herrmann).  Frank Hirth is an accounting firm that specializes in international tax matters.  Tr. 61:1-2 (Hocking).  Paul Hocking, the Frank Hirth accountant who worked primarily with the

Herrmanns in preparing their tax returns, specifically concentrates on tax matters concerning American citizens resident in the U.K. who need to file tax returns in both countries. *See* Tr. 58:5-10 (Hocking); Tr. 695:10 to 696:10 (J. Herrmann). Prior to preparing the Herrmanns' 2008 U.S. tax return, neither the Herrmanns nor Frank Hirth received a tax reporting statement from PELLP for the 2008 tax year. *See* Tr. 72:21 to 73:9 (Hocking); Tr. 943:11 to 949:9 (M. Herrmann). Ms. Herrmann requested this information from PELLP to no avail. *See* Tr. 944:5 to 949:9, 964:3 to 967:14 (M. Herrmann); *see also* JX 80 (E-mail chain among Mina Gerowin Herrmann and Frank Hirth employees regarding the Herrmanns' 2008 U.S. tax return) at J-80_0001 to -02. Consequently, the Herrmanns reported the salary Ms. Herrmann received from PELLP in 2008 on their original 2008 U.S. tax return, but did not report the $18 million payment that they received in January 2009. *See* JX 27 (original 2008 U.S. tax return for the Herrmanns) at J-27_0001.

The Herrmanns also engaged Frank Hirth to prepare their U.K. tax returns for the U.K. tax years ending on April 5, 2008 ("2008 U.K. tax return") and April 5, 2009 ("2009 U.K. tax return"). Tr. 64:2-6, 13-15 (Hocking). The U.K. tax reporting year ends on April 5, and thus is offset by three months from the calendar reporting year ordinarily used by U.S. partnerships and individuals. *See, e.g.*, JX 13 at J-13_0007 (defining "Year End Date" for purpose of the PELLP partnership agreement); Tr. 64:8-10 (Hocking) ("The U.K. has a fiscal year ending the 5th of April, and the U.S. has a calendar year of the 31st of December."). On Ms. Herrmann's 2008 U.K. tax return, she reported her "share of the partnership's profit or loss" from PELLP from January 15, 2008 to April 5, 2008 as £106,382, equal to her salary for those months. JX 22 (2008 U.K. tax return for Mina Gerowin Herrmann) at J-22_0011. She owed £36,785.40 in U.K. income taxes for that year. *Id.* at J-22_0017. Because Ms. Herrmann paid taxes to the U.K. in 2008 and earned taxable income from countries other than the U.S. and the U.K., the Herrmanns reported a foreign tax credit of $87,871 on their original 2008 U.S. tax return. *See* JX 27 at J-27_0002, J-27_0025 to -29. Ms. Herrmann's 2009 U.K. tax return reported her "share of the partnership's profit or loss" from PELLP as £14,832,477, which includes the $18 million payment as reflected on the PELLP U.K. partnership statement for that year. JX 23 (2009 U.K. tax return for Mina Gerowin Herrmann) at J-23_0007; Tr. 66:1 to 68:1 (Hocking). Her U.K. tax liability for that year was £6,035,448.77. JX 23 at J-23_0015. The Herrmanns thus reported a foreign tax credit of $5,087,454 on their 2009 U.S. tax return. *See* DX 118 (original 2009 U.S. tax return for the Herrmanns) at 118.0002, 118.0023 to -26.

Additionally, Frank Hirth prepared the Herrmanns' 2009 U.S. tax return. Tr. 84:24 to 85:1 (Hocking). The Herrmanns unexpectedly received a Schedule K-1 from PELLP for the 2009 U.S. tax year in September 2010, but it did not include the $18 million payment. *See* JX 41 (2009 PELLP Schedule K-1 for Mina Gerowin Herrmann) at J-41_0001; Tr. 84:15 to 85:14, 86:9 to 87:3 (Hocking).[7] At the time, however, both the Herrmanns and Frank Hirth believed that the 2009 Schedule K-1 included the $18 million payment. *See* Tr. 971:18 to 972:7 (M. Herrmann). Frank Hirth advised the Herrmanns to rely on the 2009 Schedule K-1 when filing their 2009 U.S. tax return because they had no basis to believe that it did not accurately reflect Ms. Herrmann's

---

[7]The 2009 Schedule K-1 also indicated that Ms. Herrmann had approximately a 0.5% capital interest in PELLP. *See* JX 41 at J-41_0001, Section J; Tr. 92:10 to 93:7 (Hocking).

2009 partnership income from PELLP, including the $18 million payment.  Tr. 90:20 to 91:4 (Hocking).  Therefore, on their original 2009 U.S. tax return, the Herrmanns reported Ms. Herrmann's partnership income from PELLP as stated on the Schedule K-1 but did not separately report the $18 million payment.  *See* DX 118 at 118.0001.  After receiving the 2009 Schedule K-1, Ms. Herrmann again inquired to PELLP and Paulson & Co. regarding a Schedule K-1 for 2008, but did not receive a K-1 or any related documentation for that year.  *See* Tr. 969:7 to 971:22 (M. Herrmann).  The court explicitly finds that the Herrmanns believed they had reported all their taxable income for 2009 on their 2009 U.S. tax return and were not attempting to avoid paying U.S. taxes on the $18 million payment.

### *D. PELLP's 2008 U.S. Tax Return*

On its 2008 Form 1065 partnership tax return, PELLP reported its ordinary business income as $77,835,029.  PX 99 (Form 1065: 2008 U.S. Return of Partnership Income, Paulson Europe LLP at 1.  This return also included 2008 an "Analysis of Partners Capital Accounts:"

## Schedule K-1, Item L - Analysis of Partners Capital Accounts

| Partner Number | A. Capital Account at Beginning of Year | B. Capital Contributed During Year | C. Partners' Shares of Sch. M-2, Lines 3, 4, and 7 | D. Withdrawals and Distributions | E. Capital Account at End of Year |
|---|---|---|---|---|---|
| 1 | 7,818,202. | | 6,922,602. | 1,900,229. | 12,840,575. |
| 2 | 9,100. | 166,456. | 41,460,176. | 41,460,176. | 175,556. |
| 3 | 9,120. | | 2,914,889. | 2,914,888. | 9,121. |
| 4 | | 59,202. | 19,221,825. | 19,221,826. | 59,201. |

*Id.* at 26.  The entry for Partner 4 appears to include the $18 million payment to Ms. Herrmann.  Nonetheless, a Schedule K-1 identifying Ms. Herrmann and setting forth the partnership distributions she received for 2008 was not filed with PELLP's 2008 U.S. tax return.  The only Schedule K-1 included with the return is for Paulson Ltd.  *See id.* at 31.[8]

---

[8]Similarly, on its 2007 Form 1065, PELLP identifies three partners in Schedule K-1, Item L, but only attaches a full Schedule K-1 for Paulson Ltd.  *See* PX 315 (Form 1065: 2007 U.S. Return of Partnership Income, Paulson Europe LLP) at 19-24.

Each page of PELLP's 2008 Form 1065 includes a facsimile annotation and corresponding page numbers at the bottom of each page, beginning at page 6 and ending at page 35.  *See* PX 99.  The original 2008 Schedule K-1 for Ms. Herrmann, which Ms. Herrmann received during the PELLP audit in 2011, has the same facsimile annotation with page numbers 44 through 47.  *See* PX 100 (Original 2008 Schedule K-1 for Mina Gerowin Herrmann).  The court agrees with the testimony elicited at trial, and explicitly finds, that the Schedule K-1 for Ms. Herrmann, as well as the Schedule K-1s for the other PELLP partners, were prepared concurrently with PELLP's 2008 Form 1065 but were not submitted to the IRS, *see* Tr. 720:8 to 724:20 (J. Herrmann), and that the K-1 prepared for Ms. Herrmann was not provided to her.

*E. The IRS's Audits of the Herrmanns and PELLP*

The IRS began its audits of both the Herrmanns and PELLP for the 2008 tax year on April 15, 2011. JX 55 (Letter from Joseph G. Scott, Internal Revenue Agent to Jeffrey W. Herrmann and Mina Gerowin Herrmann (Apr. 15, 2011)); PX 256 (Letter from Joseph Scott to PELLP (Apr. 15, 2011)).[9] On the same day, the IRS issued an Information Document Request ("IDR") to the Herrmanns regarding PELLP and Ms. Herrmann's role there. *See* JX 56 (IDR Request No. 2 issued to Jeffrey W. Herrmann and Mina Gerowin Herrmann (Apr. 15, 2011)) at J-56_0002 to -03. The IRS also issued an IDR to PELLP requesting the names and addresses of each partner who held an interest in the partnership during the 2008 tax year to allow the IRS to notify the partners of the audit. *See* JX 63 (IDR Request No. 5 issued to PELLP (Apr. 15, 2011)).

On April 22, 2011, the IRS issued a Notice of Beginning of Administrative Proceeding ("NBAP") to Paulson Ltd. PX 257 (NBAP issued to Paulson Ltd. (Apr. 22, 2011)). Ms. Herrmann did not receive an NBAP informing her of the PELLP audit until October 17, 2011, approximately six months later. JX 57 (NBAP issued to Mina Gerowin Herrmann (Oct. 17, 2011)). The NBAP directed Ms. Herrmann to "contact [PELLP's] Tax Matters Partner if [she] would like to participate in the proceedings." *Id.* at J-57_0001. Paulson Ltd. was PELLP's tax matters partner. *See* JX 13 at J-13_0014 (explaining that Paulson Ltd., as the corporate member of PELLP, has "exclusive responsibility" for managing and controlling the affairs of PELLP).

In 2011, the IRS issued a series of IDRs to the Herrmanns regarding the audit of their 2008 U.S.tax return. On April 15, 2011, the IRS requested that the Herrmanns provide a Schedule K-1 or W-2 from PELLP for the 2008 tax year, and the Herrmanns, through their representatives at Frank Hirth, responded that PELLP did not provide Ms. Herrmann with either form for the 2008 tax year. *See* JX 35 (IDR Request No. 3 issued to Jeffrey W. Herrmann and Mina Gerowin Herrmann (Apr. 15, 2011)) at J-35_0002, J-35_0004. On May 20, 2011, the IRS requested further clarification of Ms. Herrmann's role at PELLP through an additional IDR. *See* JX 64 (IDR Request No. 5 issued to Jeffrey W. Herrmann and Mina Gerowin Herrmann (May 20, 2011)). In response, the Herrmanns explained that Ms. Herrmann joined PELLP as a limited partner in 2008 and that she spent all of her working time "on duties in relation to the Paulson Europe partnership." *Id.* at J-64_0003. The Herrmanns also represented that Ms. Herrmann only received $335,417 as income from PELLP in 2008 because she did not receive the $18 million payment until 2009. *Id.*

Around August 19, 2011, Ms. Herrmann received for the first time a 2008 Schedule K-1 from PELLP. *See* PX 83 (E-mail from Joseph Scott to Nicola Dunn (Aug. 19, 2011)) at 2-3; PX 100; Tr. 123:1-12 (Hocking); Tr. 785:15-18 (J. Herrmann); Tr. 978:7-23 (M. Herrmann). This Schedule K-1 showed that Ms. Herrmann received a total partnership distribution of $19,221,826 in 2008, including the $18 million payment, but it erroneously listed Ms. Herrmann's foreign

---

[9]As early as January 2011, the IRS had begun investigating PELLP for "audit potential." *See* PX 254 (Mina Gerowin Herrmann 2008 and 2009 Comparative Facts) at 1. At that time, the IRS noted that Ms. Herrmann was a partner in PELLP and received a Schedule K-1 in 2009, but that PELLP did not issue a Schedule K-1 for Ms. Herrmann in 2008. *See id.* at 1-3.

source income from the partnership in Box 16-B as $3,237,873.  *See* PX 100 at 1; Tr. 123:13 to 124:9 (Hocking).  After the IRS and the Herrmanns received the 2008 Schedule K-1, the IRS requested that the Herrmanns explain the discrepancy between the Schedule K-1 and the Herrmanns' original 2008 tax return.  *See* DX 49 (IDR Request No. 6 issued to Jeffrey W. Herrmann and Mina Gerowin Herrmann (Aug. 19, 2011)) at 049.0001.  The Herrmanns responded that they were unaware of the inconsistency upon filing their 2008 U.S. tax return because they had not previously received a Schedule K-1 for 2008.  *Id.* at 049.0002.  The IRS then issued an additional IDR to clarify when Ms. Herrmann received the $18 million payment and why the K-1 had not been included with the Herrmanns' original 2008 U.S. tax return.  *See* JX 82 at J-82_0003 to -04.  Plaintiffs explained that Ms. Herrmann requested a 2008 Schedule K-1 from the "finance contact" at PELLP but did not receive it until 2011, and that Ms. Herrmann "believed that she was not required to receive a K-1 from [PELLP]" because it was a non-U.S. entity.  *Id.* at J-82_0005.  Plaintiffs also included a copy of a bank statement reflecting that they received the $18 million payment in their joint bank account on January 6, 2009.  *Id.* at J-82_0008.

The IRS held conference calls with Paulson Ltd. representatives regarding the PELLP audit throughout 2011, prior to Ms. Herrmann's receipt of the NBAP for the PELLP audit.  *See, e.g.*, PX 263 (E-mail from Jeffrey Bortnick to Joseph Scott (Aug. 16, 2011)) (scheduling a call with the IRS regarding the PELLP audit and referencing prior calls that had been held).  Ms. Herrmann was not notified of these calls or provided with the opportunity to participate in any other aspect of the PELLP audit during 2011.  *See* Tr. 710:21 to 711:12 (J. Herrmann); Tr. 979:9-20 (M. Herrmann).  Ms. Herrmann's representatives at Frank Hirth also did not participate in the PELLP audit.  *See* Tr. 760:1-9 (Test. of Nicola Dunn).  By September 30, 2011, a few weeks before Ms. Herrmann received the NBAP for the PELLP audit, the IRS had accepted the responses to and closed out several IDRs regarding the PELLP audit without any participation from the Herrmanns or their representatives.  *See* PX 294 (E-mail from Joseph Scott to Jeffrey Bortnick (Sept. 30, 2011)) at 2; Tr. 432:9 to 433:17 (Test. of Joseph Scott).

On April 13, 2012, the IRS issued plaintiffs a Notice of Computational Adjustment based on the erroneous Schedule K-1 for 2008 that had been provided in August 2011.  *See* JX 39 (Notice of Computational Adjustment for Jeffrey W. Herrmann and Mina Gerowin Herrmann (Apr. 13, 2012)).  The Notice of Computational Adjustment included Form 4549-A, entitled Income Tax Discrepancy Adjustments, which served as "a K-1 True-up prompt/quick assessment report" and stated that the Herrmanns had underreported their income on their 2008 U.S. tax return and had a tax due of $6,686,901.  *See id.* at J-39_0003 to -04.  In determining the tax due, Form 4549-A also included foreign tax credits of $87,871, the amount of credits claimed on plaintiffs' original 2008 U.S. tax return.  *Id.* at J-39_0003; JX 27 at J-27_0002.  The Notice of Computational Adjustment also included Form 886-A, which explained the IRS's conclusion that the $18 million bonus was a partnership distribution from PELLP to Ms. Herrmann pursuant to the 2008 Schedule K-1 and therefore was "includable in income as of December 31, 2008." *See* JX 39 at J-39_0007 to -13.

On the same day as the Notice of Computational Adjustment, the IRS issued another IDR to the Herrmanns requesting a justification for the Herrmanns' proposal to switch from the cash method to the accrual method for determining foreign tax credits on their amended 2008 U.S. tax

return.  *See* JX 38 (IDR Request No. 9 issued to Jeffrey W. Herrmann and Mina Gerowin Herrmann (Apr. 13, 2012)) at J-38_0002.  Through Frank Hirth, the Herrmanns responded to this IDR on May 23, 2012, explaining that foreign taxes on the $18 million payment should be deemed accrued as of December 31, 2008, when the bonus was ordered to be paid, such that the taxes paid by the Herrmanns to the U.K. for the year ending April 5, 2009 could be credited against the Herrmanns' 2008 U.S. tax liability.  *See id.* at J-38_0004 to -10.  This response also noted that Ms. Herrmann was a member of PELLP in 2008.  *Id.* at J-38_0004.  The response further appended a proposed amended 2008 U.S. tax return for the Herrmanns that includes the $18 million payment as a partnership distribution in 2008 and reflects the accrual method of determining foreign tax credits, applying a credit of $6,691,965 with $8,006,997 credit available based on U.K. taxes paid in the year ending March 31, 2009.  *See id.* at J-38_0013 to -22.

On July 6, 2012, Ms. Herrmann, Paul Hocking from Frank Hirth, and James Casimir participated in a conference call with the IRS regarding the audit of the Herrmanns' 2008 U.S. tax return.  *See* JX 67 (E-mail from Joseph Scott to Eric Cirelli (July 6, 2012)) at J-67_0001.[10] This was the only such call in which Ms. Herrmann participated.  *See* Tr. 984:1-7 (M. Herrmann).  During the call, Ms. Herrmann reiterated that she inquired at PELLP about receiving a 2008 Schedule K-1 but did not receive it until the PELLP audit.  JX 67 at J-67_0001. She also explained that "[s]he became a minority partner in [PELLP] so that the hedge fund would not have to pay social security taxes in [the] U.K." and that she did not have the option to be an employee at PELLP rather than a member of the partnership.  *Id.*  Additionally, Ms. Herrmann's representatives disputed portions of the Form 886-A included with the Notice of Computational Adjustment, and the IRS noted certain transposed numbers to be corrected.  *Id.* Finally, Mr. Casimir requested that the PELLP closing conference, scheduled for later that month, be held in person rather than telephonically.  *Id.*  The IRS audit team explained that both the IRS and Paulson Ltd. preferred a telephonic conference "due to the lack of substantive issues on the partnership examination."  *Id.*  A member of the IRS team also stated that Ms. Herrmann was "not entitled to participate in the closing conference since she [wa]s less than 1% partner and therefore deemed a non[-]notice partner."  *Id.*[11]

Prior to the closing conference for the PELLP audit, Mr. Hocking e-mailed a series of questions to the IRS audit team regarding the audit proceedings and how they "impact[ Ms. Herrmann's] case as a partner in PELLP."  *See* JX 68 (E-mail from Joseph Scott to Joseph Scott (July 25, 2012); E-mail from Jim Casimir to Joseph Scott (July 18, 2012)) at J-68_0001.  The IRS team noted that it "made a mistake" in previously identifying Ms. Herrmann as a non-notice

---

[10]Mr. Casimir "represented the Herrmanns in connection with their individual audit and the IRS's audit of PELLP.  Mr. Casimir's representation started in June 2012."  Joint Stipulation ¶ 28.

[11]Although the parties presented differing evidence, Ms. Herrmann appears to have owned no more than a 4% interest in PELLP.  *Compare* PX 101 (Corrected 2008 Schedule K-1 for Mina Gerowin Herrmann) at 1 (listing Ms. Herrmann's capital share in PELLP at 0.45%), *with* DX 125 (E-mail from Candace Allen to Mina Gerowin Herrmann, et al. (Jan. 3, 2012); E-mail from Candace Allen to Christopher Bodak, et al. (Nov. 3, 2011)) at 125.0002 (listing Ms. Herrmann's ownership share of PELLP at 4%).

partner, but stated that the IRS was only obligated to provide her with the NBAP and the Final Partnership Administrative Adjustment. *Id.* at J-68_0002. The e-mail also noted that PELLP elected to file a Form 1065 as its partnership tax return, even though such a filing was not mandatory because PELLP was a foreign partnership with no U.S.-sourced income. *Id.* at J-68_0003; *see also* PX 99. At trial, Mr. Hocking testified that, although the IRS appeared to answer his questions, he never received the answers in either a responsive e-mail or in a separate letter from the IRS audit team. *See* Tr. 141:18 to 142:18 (Hocking).

The IRS held a telephonic closing conference for the PELLP audit on July 26, 2012. The IRS had requested a waiver of the closing conference, *see* DX 11 (E-mail from Stuart Merzer, General Counsel & CCO, Paulson & Co. to Mina Gerowin Herrmann (June 28, 2012)), but Ms. Herrmann did not grant her consent to the waiver, *see* Tr. 1114:7-19 (M. Herrmann). Thus, despite the IRS's previous representation that Ms. Herrmann could not participate in the PELLP closing conference, she and her representatives, Mr. Hocking and Mr. Casimir, were on the call. *See* JX 61 (E-mail from Joseph Scott to Eric Cirelli (July 26, 2012)) at J-61_0001. During the conference, Mr. Hocking and Mr. Casimir "interrupted" the IRS audit team several times to discuss Ms. Herrmann's disputes with the PELLP audit and her personal audit. *See* JX 61 at J-61_0001 to -02. The audit team directed them to the agenda for the meeting and "reminded [Mr. Hocking] that the agenda w[ould] be followed." *Id.* at J-61_0001. Mr. Hocking then "relented and remain[ed] quiet." *Id.* The IRS's agenda for the closing conference was truncated:

AGENDA

1.  Participant Introduction

2.  No Change Report

    1.  F/X Loss reporting

    2.  Identity of Partner(s) and their
        distributive share

3.  Close case

(NOTE: NO other items will be discussed at this conference)

JX 60 (Agenda, TEFRA Proceedings – Closing Conference (July 26, 2012)).

A letter allegedly sent to Ms. Herrmann's representatives on July 20, 2012 supposedly answered the questions previously sent by Mr. Hocking to the IRS team, JX 61 at J-61_0002, but such a letter was not proffered at trial.[12] Mr. Hocking testified that the IRS audit team

---

[12]Mr. Hocking stated at trial that the letter sent to him by the IRS on July 20, 2012 did not answer his previously e-mailed questions, but rather was a notice stating that the Herrmanns had "three months left to pay the tax in order to register an appeal." *See* Tr. 142:8-18 (Hocking).

coordinator "conducted the conference to exclude or rebut any question or query that [Mr. Hocking] raised on behalf of [Ms. Herrmann] [a]nd effectively refused to answer any questions." Tr. 144:7-17 (Hocking). When the conference ended, Mr. Casimir requested conference notes from IRS counsel, who declined to provide them. JX 61 at J-61_0002. The IRS closed the PELLP audit on August 30, 2012 upon issuance of a no adjustments letter, indicating that no changes were necessary for PELLP's 2008 U.S. tax return. JX 52 (No Adjustments Letter (Aug. 30, 2012)) at J-52_0002.

Approximately six weeks earlier, on July 17, 2012, a PELLP representative had informed the IRS that the Schedule K-1 for 2008 provided to the Herrmanns in 2011 was erroneous. *See* PX 232 (E-mail from Joseph Scott to Jeffrey Bortnick (July 17, 2012)); Tr. 411:12 to 413:3 (Scott). Around July 19, 2012, the IRS received a corrected Schedule K-1 from PELLP that listed Ms. Herrmann's foreign source income from PELLP in Box 16-B as $21,499,055. *See* PX 101; JX 30 (E-mail from Nicola Dunn to Joseph Scott (Oct. 12, 2012); Form 843 for Jeffrey W. Herrmann and Mina Gerowin Herrmann and Statement in Explanation of Claim for Refund (Oct. 12, 2012)) at J-30_0013.

On July 30, 2012, "the IRS issued plaintiffs a Notice of Tax Due and Notice of Intent to Levy showing tax and interest due of approximately $7.5 million." *Herrmann v. United States*, 124 Fed. Cl. 56, 61 (2015) ("*Herrmann I*"); *see also* JX 30 at J-30_0004 (characterizing these notices as "a demand for payment"). In light of the Notice of Tax Due and the corrected 2008 Schedule K-1 for Ms. Herrmann, plaintiffs filed an amended 2008 tax return on August 7, 2012. *See* JX 29 (2008 U.S. tax return for the Herrmanns (amended Aug. 7, 2012)). The Herrmanns reported the $18 million payment as partnership income for 2008, *see id.* at J-29_0003; J-29_0021, and claimed a foreign tax credit of $6,691,965 based on foreign taxes accrued as of December 31, 2008, *see id.* at J-29_0004, J-29_0025 to -26.[13] This amended return indicated that plaintiffs owed additional federal taxes of $37,601. *Id.* at J-29_0001. "The IRS did not accept the amended 2008 return as fulfillment of the plaintiffs' tax obligation." *Herrmann I*, 124 Fed. Cl. at 62 (citation omitted).

### F. Refund Claim and Appeal

On October 11, 2012, the Herrmanns paid the IRS $7,860,434.87, comprising $6,649,300 in taxes and $1,211,134.87 in interest, to satisfy taxes due as stated in the Notice of Computational Adjustment. *Herrmann I*, 124 Fed. Cl. at 62. The next day, they filed, through Frank Hirth, a claim for refund and request for abatement with the IRS. *See* JX 30 at J-30_0003. The claim sought a refund of the tax paid on three alternative grounds. *Id.* at J-30_0006 to -08. Under Alternative Claim #1, the primary ground for relief, the Herrmanns alleged that the $18 million payment was made to Ms. Herrmann in a non-partner capacity pursuant to I.R.C. § 707(a)(2)(A) and should be taxed in the year Ms. Herrmann received it, 2009, rather than in the year reflected on the late-produced 2008 Schedule K-1. *Id.* at J-30_0015 to -16. Alternative Claim #2 alleged that, if the $18 million payment was deemed to be made to Ms. Herrmann

---

[13]"Plaintiffs were cash-basis taxpayers, not accrual-basis taxpayers, but they sought permission to file their amended 2008 U.S. tax return as accrual-basis taxpayers for foreign-tax credit purposes." *Herrmann I*, 124 Fed. Cl. at 62 n.9.

within her capacity as a partner of PELLP, the Herrmanns should be permitted to elect the accrual method on their 2008 U.S. tax return to determine foreign tax credits pursuant to I.R.C. § 905(a), such that U.K. taxes on the $18 million payment would accrue on December 31, 2008. *See id.* at J-30_0016 to -20.  The Herrmanns sought a full refund of the tax paid under both Alternative Claim #1 and Alternative Claim #2.  *See id.* at J-30_0007.  Alternative Claim #3 sought a partial refund, alleging that the IRS's computation of tax owed by the Herrmanns was erroneous because it relied on the original 2008 Schedule K-1 that did not accurately report Ms. Herrmann's 2008 partnership income from PELLP and therefore did not properly account for foreign tax credits applicable to the 2008 tax year, including a carryback from 2009.  *Id.* at J-30_0022.

Following a conference call with the IRS and the Herrmanns' counsel and representatives on December 7, 2012, the Herrmanns filed a supplemental letter with the IRS on December 20, 2012.  *See* DX 103 (Letter from Abraham N.M. Shashy, Partner, King & Spalding LLP to Eric Cirelli, IRS (Dec. 20, 2012)).  This letter reiterated plaintiffs' argument pursuant to I.R.C. § 707(a)(2)(A) under Alternative Claim #1, *see id.* at 103.0012 to -25, and argued for the first time that Ms. Herrmann should not be categorized as a *bona fide* partner in PELLP for U.S. tax purposes, *id.* at 103.0009 to -12.

The IRS proposed disallowance of plaintiffs' refund claim on September 10, 2013.  *See* JX 40 (Claim Disallowance Letter for Herrmann Refund Claim (Sept. 10, 2013)).  The IRS determined under Alternative Claim #1 that the $18 million payment was a partnership distribution to Ms. Herrmann rather than a payment for services outside her capacity as a partner under I.R.C. § 707(a)(2)(A).  *See id.* at J-40_0009 to -15.  With regard to Alternative Claim #2, the IRS held that the Herrmanns were bound by their original election of reporting foreign tax credits on the cash basis and could not switch to the accrual method.  *See id.* at J-40_0016 to -21.  Finally, the IRS disallowed Alternative Claim #3 so it could be considered on appeal with the Herrmanns' other claims.  *See id.* at J-40_0030.  Carrying back foreign tax credits to the 2008 tax year under Alternative Claim #3 also would have required the Herrmanns to amend their 2009, 2010, and 2011 tax returns, which they declined to do at that time.  *See id.* at J-40_0029.

The Herrmanns protested the claim disallowance before the IRS Appeals Office.  *See Herrmann I*, 124 Fed. Cl. at 63.  In 2014, the IRS Appeals Office upheld the disallowance on all grounds and refused to refund the $7,860,434.87 paid by plaintiffs to the IRS for the 2008 tax year.  *See id.*; DX 114 (Appeals Case Mem.).

## PROCEDURAL HISTORY

Plaintiffs filed suit in this court on October 3, 2014, alleging that they are entitled to a refund of the $7,860,434.87 paid to the IRS to satisfy the notice of tax due, plus interest.  *See generally* Compl.  Plaintiffs specifically assert four counts against the government:

> In Count One of their complaint, the Herrmanns assert that even if they were obligated to report the $18 million payment on their 2008 U.S. tax return, the IRS overcharged them by approximately $5.2 million because it failed to carry back a foreign tax credit to which they were entitled based on income taxes they

13

paid to the United Kingdom in 2009. In Count Two, the Herrmanns contend that the $18 million payment was not a partnership distribution but a bonus paid to Ms. Herrmann in her capacity other than as a partner, and therefore the plaintiffs—as cash-basis taxpayers—did not need to report the payment until they received it in 2009. The Herrmanns claim in Count Three that the IRS improperly denied their request to adopt the accrual accounting method for the purposes of the foreign tax credit in 2008. Finally, in Count Four plaintiffs assert that during the audit of PELLP in 2011 and 2012, the IRS violated [TEFRA].

*Herrmann I*, 124 Fed. Cl. at 58. The government filed a motion to dismiss Counts Two and Four of plaintiffs' complaint for lack of subject matter jurisdiction and plaintiffs filed a motion for partial summary judgment respecting Count One, both of which the court denied. *See id.* at 58-59. The court also determined that "on the merits, the allegations of Count Four mesh with those of Counts One and Two and do not provide an independent basis for monetary relief," therefore rendering Count 4 "supplementary to Counts One and Two." *Id.* at 68. The court subsequently entered a protective order in this case on March 31, 2016, ECF No. 42, which was modified on May 18, 2016, ECF No. 54; *see also Herrmann v. United States*, 127 Fed. Cl. 22, 43-44 (2016) ("*Herrmann II*") (explaining amendments to the protective order).

A six-day trial began on January 23, 2017.[14] Following post-trial briefing and closing argument, the case is ready for disposition.

## STANDARDS FOR DECISION

Although tax refund claims must originally be presented to the IRS, a tax refund suit is a *de novo* proceeding in which the taxpayer bears the burden of proving his or her case by a preponderance of the evidence. *See Gingerich v. United States*, 77 Fed. Cl. 231, 240 (2007) (citing *Sara Lee Corp. v. United States*, 29 Fed. Cl. 330, 334 (1993) (in turn citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935); *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932), *modified by* 284 U.S. 599 (1932); *Rockwell v. Commissioner*, 512 F.2d 882, 885 (9th Cir. 1975) (Duniway, J.); *George E. Warren Corp. v. United States*, 141 F. Supp. 935, 940 (Ct. Cl. 1956); *Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045, 1055 (1992), *aff'd*, 26 F.3d 137 (Fed. Cir. 1994))); *see also Ebert v. United States*, 66 Fed. Cl. 287, 291 (2005); *Cook v. United States*, 46 Fed. Cl. 110, 116 (2000) (citations omitted).

---

[14]Before trial began, plaintiffs filed two motions *in limine*, the government filed two motions *in limine*, and non-parties John Paulson, Christopher Bodak, Paulson & Co., and PELLP filed one motion *in limine*. The court granted plaintiffs' and the government's respective motions for leave to file for admission of designated deposition testimony, granted plaintiffs' motion *in limine* to remove attorneys' eyes only designations from certain documents, denied the government's motion *in limine* to exclude certain evidence and testimony from trial, and denied the non-parties' motion *in limine* to testify via contemporaneous video transmission. *See Herrmann v. United States*, 129 Fed. Cl. 780, 789 (2017) ("*Herrmann III*").

**ANALYSIS**

        In Count Two, plaintiffs assert that the $18 million payment should be taxable in the 2009 U.S. tax year, when plaintiffs received the payment, because it was not a partnership distribution.  *See* Compl. ¶¶ 46-54.[15]  In support of this contention, plaintiffs argue in the alternative that Ms. Herrmann was either not a *bona fide* partner in PELLP for U.S. tax purposes, or that if Ms. Herrmann were a partner, the $18 million payment was for services performed outside her capacity as a partner pursuant to I.R.C. § 707(a)(2)(A).  *See* Pls.' Post-Trial Br. at 2-29, ECF No. 98.  For purposes of this analysis, the court assumes, but does not decide, that Ms. Herrmann was a member in PELLP in order to analyze the nature of the payment under I.R.C. § 707(a)(2)(A).[16]

_____

        [15]The court begins its analysis with Count Two rather than Count One because "the court cannot enter judgment on Count One until it has also reached a final disposition of Counts Two and Three."  *Herrmann I*, 124 Fed. Cl. at 69.  Resolution of Count One, which seeks a partial refund based on a foreign tax credit carryback, would only be necessary if the court were first to find that plaintiffs are not entitled to a full refund under either Count Two or Count Three.

        [16]The evidence addressed at trial regarding the partnership issue, *i.e.*, whether Ms. Herrmann was actually a partner or not, was nearly in equipoise, and was complicated by the fact that PELLP was an entity organized under English law that has some parallels to a U.S. partnership but not others.

        Ms. Herrmann was limited as a member of PELLP.  She did not have voting rights in the partnership, *see* Tr. 930:4-10 (M. Herrmann), or attend any partnership meetings in 2008 or 2009, *see* Tr. 933:12-14 (M. Herrmann), and she only owned a 0.45% capital share in the partnership as of December 31, 2008, PX 101 at 1.  As a U.K. limited liability partnership, PELLP initially had two "Designated Members" (Paulson Ltd. and Nikolai Petchenikov), who ensured compliance with the applicable U.K. partnership laws, and one "Member" (Harry St. John Cooper), who did not have comparable obligations.  JX 13 at J-13_0016, J-13_0021.  Ms. Herrmann joined the partnership as a "Further Member" upon arriving in London to work for PELLP in January 2008.  *See* PX 32.  As a member of a U.K. partnership, U.K. law required Ms. Herrmann to report her partnership income as a profit share on her U.K. tax returns, an obligation with which she complied.  *See, e.g.*, JX 23 at J-23_0007 (reporting Ms. Herrmann's "share of the partnership's profit or loss" at PELLP as £14,832,477 for the U.K. tax year ending April 5, 2009).  PELLP was also required to report its profit distributions to its members, including Ms. Herrmann, on its U.K. partnership tax return.  *See* DX 119 (2008 U.K. Partnership Tax Return for PELLP) at 119.0007 (reporting Ms. Herrmann's partnership income as £106,382 for the U.K. tax year ending April 5, 2008).  PELLP and its members had similar reporting obligations under U.K. Generally Accepted Accounting Principles ("GAAP") as well.  *See* DX 23 (Representation form for members – Limited Liability Partnerships ("LLP's") reporting under UK GAAP (signed by Mina Gerowin Herrmann on July 27, 2009)) at 23.0002 (reporting Ms. Herrmann's "profit share" in PELLP as £14,800,804.60 for the "[f]inancial year ended 31st March 2009"); DX 24 (Representation form for members – Limited Liability Partnerships ("LLP's") reporting under UK GAAP (signed by Mina Gerowin Herrmann on June 17, 2008)) at

I.R.C. § 707 provides in pertinent part:

(a) Partner not acting in capacity as partner. –

> (1) In general. – If a partner engages in a transaction with a partnership
> other than in his capacity as a member of such partnership, the
> transaction shall, except as otherwise provided in this section, be

---

24.0002 (reporting Ms. Herrmann's "profit share" in PELLP as £44,010.62 for the "[f]inancial year ended 31st March 2008").

       PELLP was not obligated to report as a partnership for U.S. tax purposes because it was a foreign partnership with no U.S.-sourced income. *See* Def.'s Post-Trial Br. at 14 & n.16, ECF No. 102. Nonetheless, for the 2008 U.S. tax year, PELLP elected to file as a U.S. partnership by filing a Form 1065. *See* PX 99. For U.S. tax purposes, PELLP reported its taxes on a calendar year basis on its Form 1065, even though its fiscal year followed the U.K. tax year and it filed U.K. taxes on that basis. *Compare* PX 99 (reporting PELLP's U.S. tax obligations for calendar year 2008), *with* DX 119 (reporting PELLP's U.K. tax obligations for the tax year ending April 5, 2008). On its Form 1065, PELLP was obligated to report all distributions made to its partners during that year and to file Schedule K-1s for each partner with the IRS. *See* Instructions for Form 1065 (2008), https://www.irs.gov/pub/irs-prior/i1065--2008.pdf, at 23; *see also* Tr. 157:16-24 (Hocking) (explaining that if PELLP had not elected to file a Form 1065, it would not be required to file Schedule K-1s for its partners). As previously explained, PELLP reported an anonymous list of partnership distributions on its 2008 Form 1065 at Schedule K-1, Item L, which included the $18 million payment to Ms. Herrmann, but only filed a K-1 for Paulson Ltd., not for Ms. Herrmann or the other members of PELLP. *See* PX 99 at 26, 31; *see also supra*, at 7 & n.8.

       Paulson Ltd. was required to file a Form 8865, Return of U.S. Persons with Respect to Certain Foreign Partnerships, with the IRS for 2008 because it was a U.S. person that owned more than 50% of PELLP, a foreign partnership, and therefore was a "control[ling]. . . partner." *See* Instructions for Form 8865 (2008), https://www.irs.gov/pub/irs-prior/i8865--2008.pdf, at 1. Form 8865 has several filing requirements, including the filing of Schedule K-1s for the controlling partner and for other U.S. persons who own 10% or more of the foreign partnership. *Id.* at 6; *see also* Def.'s Post-Trial Br. at 14 n.16. If a foreign partnership has filed a Form 1065 for the same tax year, the controlling partner may file "a copy of the completed Form 1065 . . . schedules in place of the equivalent schedules of Form 8865." Instructions for Form 8865 (2008) at 3. There is no evidence in the trial record that Paulson Ltd. filed a Form 8865 in 2008. PELLP's 2008 Form 1065, however, appears to satisfy Paulson Ltd.'s filing obligations for Form 8865 rather than PELLP's obligations for Form 1065. *See* PX 99. PELLP's filing includes a Form 1065 and appends a Schedule K-1 for Paulson Ltd. as the controlling partner, as required for Form 8865, but does not include Schedule K-1s for the other members of PELLP who owned a less than 10% stake in the partnership, as required for Form 1065. *See id.*

considered as occurring between the partnership and one who is not a partner.

(2) Treatment of payments to partners for property or services. – Under regulations prescribed by the Secretary –

(A) Treatment of certain services and transfers of property. – If –

(i) a partner performs services for a partnership or transfers property to a partnership,

(ii) there is a related direct or indirect allocation and distribution to such partner, and

(iii) the performance of such services (or such transfer) and the allocation and distribution, when viewed together, are properly characterized as a transaction occurring between the partnership and a partner acting other than in his capacity as a member of the partnership,

such allocation and distribution shall be treated as a transaction described in paragraph (1).

I.R.C. § 707(a).  Paragraph (a)(2) was added to I.R.C. § 707 in 1984 and clarifies situations in which partners engage with the partnership outside their capacity as partners.  *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, Div. A., Title I, § 73(a), 98 Stat. 494, 591.[17] Relevant here, Subparagraph (a)(2)(A) addresses situations in which partners perform services for a partnership outside their role as a member of the partnership and receive a commensurate payment from the partnership for those services that is not classifiable as a partnership distribution.  The payment is treated "as a payment to a non-partner in determining the partner['s] share[] of taxable income or loss" when the circumstances attendant to both the payment and the services "have the substantive economic effect of direct payment[] for such . . . services."  Staff of S. Comm. on Finance, Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, S. Print No. 98-169, Vol. I, at 226.

In this case, the $18 million payment to Ms. Herrmann is appropriately categorized as a payment for services outside her capacity as a partner, not as a partnership distribution, pursuant to I.R.C. § 707(a)(2)(A).  First, the services performed by Ms. Herrmann when she worked at PELLP in 2008 did not change when she transferred from Paulson & Co. in New York to PELLP in London and became a member of PELLP.  *See* Tr. 494:1-21 (Paulson); Tr. 892:25 to 893:4,

---

[17]The Treasury Department did not propose regulations under I.R.C. § 707(a)(2)(A) until 2015.  *See generally* Disguised Payments for Services, 80 Fed. Reg. 43652 (proposed July 23, 2015).  Thus, for the years at issue in this case, there are no applicable Treasury regulations that interpret the relevant subsection.  In all events, to date, the proposed regulations have not been promulgated in final form.

923:9-14 (M. Herrmann).  She continued to analyze investment opportunities and recommend investments for the merger and event funds managed by Paulson & Co.  *See* Tr. 892:25 to 893:4, 893:25 to 894:13 (M. Herrmann).  None of these funds were owned by PELLP or based in London; rather, Ms. Herrmann's job duties at PELLP continued to center around Paulson & Co.'s business in New York.  *See* JX 44 at J-44_0003 (showing that Paulson & Co. was the "[m]ulti [s]trategy [e]vent [m]anager" for the merger and event funds); Tr. 897:6-13 (M. Herrmann) (explaining that PELLP was a "legal . . . conduit" for Paulson & Co. and its employees to do business in Europe).  She only relocated to London to have easier access to European investment opportunities for the merger and event funds, and became a "member" of PELLP so that PELLP could avoid certain U.K. tax obligations.  *See* Tr. 317:11-20 (Bodak); Tr. 889:13 to 890:8, 921:3-17 (M. Herrmann); *see also* S. Print No. 98-169, at 228 (explaining that "whether . . . it appears that the recipient became a partner primarily to obtain tax benefits for himself or the partnership which would not have been available if he had rendered the services to the partnership in a third party capacity" is relevant to determining whether a payment is a partnership distribution under I.R.C. § 707(a)(2)(A)).  In her work at PELLP, Ms. Herrmann did not perform any services on behalf of the partnership itself, but rather the partnership served as a European conduit for Ms. Herrmann to perform the same services she performed as an employee of Paulson & Co.  *See* Tr. 494:8-17 (Paulson); Tr. 897:6-13 (M. Herrmann).

Additionally, the circumstances surrounding the issuance and receipt of the $18 million payment indicate that it was not a partnership distribution.  Ms. Herrmann's compensation arrangement, which remained the same when she transferred from Paulson & Co. to PELLP, was not tied to the success of PELLP in any way.  *See* Tr. 893:13-18, 901:13-16 (M. Herrmann) (explaining that Ms. Herrmann's compensation "had nothing to do with [PELLP]").  Rather, Mr. Paulson tied Ms. Herrmann's formulaic bonus to the yearly performance of the merger and event funds.  *See* JX 1 at J-1_0001; Tr. 898:9 to 900:5 (M. Herrmann).  These funds were based at Paulson & Co. in New York; indeed, no funds of any kind were directly tied to or controlled by PELLP.  *See* Tr. 901:4-16 (M. Herrmann) (explaining that Ms. Herrmann's formulaic bonus was tied to the performance of the merger and event funds, which were separate from any revenue or profits of PELLP); *see also* Tr. 337:6-23 (Bodak) (explaining that PELLP provided investment research services for Paulson & Co.'s "various funds and managed accounts").  Ms. Herrmann's bonus was not guaranteed because it was dependent on the success of the merger and event funds, *see* Tr. 901:4-12 (M. Herrmann), but it was not linked to any profit or risk of PELLP.  PELLP did not generate profits on its own, but rather was merely a conduit for Paulson & Co. to pay its European expenses and personnel.  *See, e.g.*, PX 314 at 1; Tr. 914:3-15, 933:19-25 (M. Herrmann).  In fact, at the time the $18 million payment was issued, PELLP did not have any funds on hand to be subjected to the risks of the partnership.  *See* PX 314 at 1 (showing that PELLP did not have sufficient cash on hand to make the $18 million payment until it received an influx of cash from Paulson & Co. on December 31, 2008).  Paulson & Co. wired the money to PELLP, after Paulson & Co. determined the amount of Ms. Herrmann's formulaic bonus, so that PELLP could transmit the pertinent payments at or shortly after the end of 2008.  PX 314 at 1; Tr. 911:9-13 (M. Herrmann) ("After Paulson ha[d] figured out your bonus, they would wire it to [PELLP].  Two, three days before year end, calendar year end, when the wire had cleared, [PELLP] would turn around and wire it to us.");  *see also* Tr. 328:12-23 (Bodak) (explaining that Paulson & Co. sent money to PELLP to "make distributions to members").  The $18 million payment was entirely under the control of and therefore subject to the risks of Paulson & Co., not

18

PELLP, indicating that the payment was not a distribution of partnership profits.  *See* S. Print No. 98-169, at 227 (explaining that "[p]artners extract the profits of the partnership with reference to the business success *of the venture* while third parties generally receive payments which are not subject to this risk," such that the determination that a payment is tied to the "entrepreneurial risk" of the partnership helps to determine that the payment is a partnership distribution) (emphasis added).

Further, the $18 million payment was not a partnership distribution because it was not issued in accord with the terms of the partnership.  The PELLP partnership agreement specifically states that distributions of partnership profits to the members of partnership were to be made after the close of PELLP's accounting year, which ended on March 31.  *See* JX 13 at J-13_0010.  The $18 million payment, however, was determined according to Ms. Herrmann's bonus formula and paid at the end of the 2008 calendar year after the profitability of the merger and event funds for that year could be quantified.  Tr. 932:23 to 933:8 (M. Herrmann); *see also* Tr. 910:6-19 (M. Herrmann) (explaining that Paulson & Co. calculated formulaic bonuses based on the funds' performance for the first 50 or 51 weeks of the year to be paid at the close of the calendar year, and that a "stub" bonus was paid a few months later to reflect the funds' performance in the closing weeks of the calendar year).  Additionally, the partnership agreement states that partnership distributions were only to be made after profits were allocated to cover the expenses and liabilities of the partnership.  *See* JX 13 at J-13_0010 to -11.  Here, the $18 million payment only reflected Ms. Herrmann's formulaic bonus.  It was directly wired from Paulson & Co. to PELLP at the end of the 2008 calendar year, and no funds were siphoned off to cover expenses or liabilities for PELLP.  *See* PX 314 at 1 (showing that PELLP received £48,637,723 in cash on December 29, 2008, and distributed that cash as bonuses to Ms. Herrmann, Mr. Petchenikov, and Mr. St. John Cooper, *i.e.*, as "[m]ember [d]istributions," and as "[o]ther [c]redits" on December 31, 2008).  The $18 million payment was a direct transfer to Ms. Herrmann that was tied to the work she performed on the Paulson & Co.- managed merger and event funds in 2008, and it had no relation to the financial performance of PELLP or the partnership agreement.

The $18 million payment was also disproportionate to Ms. Herrmann's actual ownership share of the partnership.  According to various documents produced at trial, Ms. Herrmann owned between 0.45% and 4% of PELLP.  *See* PX 101 at 1 (listing Ms. Herrmann's ownership share in PELLP as of December 31, 2008 at 0.45%); DX 125 at 125.0002 (listing Ms. Herrmann's ownership share in PELLP at 4%).  Ms. Herrmann's share of PELLP's distributions for 2008, however, was about 27% of PELLP's receipts for that year.  *See* PX 99 at 5, 26 (reporting receipts of $70,519,492 and Ms. Herrmann's share (listed as Partner 4) as $19,221,825).  The disparity between Ms. Herrmann's ownership share in PELLP and the amount she received in 2008 tends to indicate that the $18 million payment was not a partnership distribution reflecting PELLP's financial results for that year, but rather a distribution for services performed outside her capacity as a member of PELLP.  *See* S. Print No. 98-169, at 228 (explaining that a payment to a partner should generally not be considered a partnership distribution when "the value of the recipient's interest in general and continuing partnership profits is small in relation to the allocation in question").

In sum, the circumstances surrounding Ms. Herrmann's work for PELLP in 2008 and the issuance of the $18 million payment indicate by a preponderance of the evidence that the payment was made to her for services performed outside her capacity as a member of PELLP under I.R.C. § 707(a)(2)(A).  The payment is thus taxable to the Herrmanns by the U.S. in the year they received it, 2009.  Plaintiffs are entitled to a full refund of the tax paid on this payment for the 2008 U.S. tax year.[18]

## CONCLUSION

For the reasons stated, the court finds that plaintiffs are entitled to a refund of $7,860,434.87, *i.e.*, the taxes and interest paid to the IRS for the 2008 U.S. tax year.  Pursuant to I.R.C. § 6611, the court further awards interest on this refund, at a rate calculated by the IRS under I.R.C. § 6621, from the date of payment until a date determined by the IRS that is no later than 30 days before the issuance of plaintiffs' refund check.  *See* I.R.C. § 6611(b)(2).[19]

The court directs the clerk to enter final judgment respecting the refund of plaintiffs' taxes and interest paid.

Plaintiffs are awarded costs pursuant to RCFC 54(d).[20]

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[18]As plaintiffs are entitled to a full refund under Count Two, the court need not resolve whether plaintiffs could elect the accrual method for determining foreign tax credits for the 2008 U.S. tax year under Count Three, or whether the Notice of Computational Adjustment was issued in error under Count Four.

[19]Plaintiffs' U.S. taxes for 2009 and subsequent tax years will have to be recalculated to account for income attributed, and foreign tax credits allocated, to those years.  That is a task for the IRS and plaintiffs, not the court.  Those tax years are not at issue in this case.

[20]If plaintiffs qualify for an award of litigation costs under I.R.C. §§ 7430(a), (c)(4)(A)(ii), (c)(4)(D)(ii), and 28 U.S.C. § 2412(d)(2)(B), the court would also entertain a petition or motion for an award of such reasonable litigation costs pursuant to I.R.C. § 7430.  Such a motion or petition for litigation costs should be filed on or before July 12, 2017.